No. DA 06-0011

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 69

_____

WILLIAM BRIAN BOETTCHER and CAROL BOETTCHER,

      Plaintiffs and Appellants,

  v.

MONTANA GUARANTY FUND, WESTERN GUARANTY
FUND SERVICES, JAMES REED, and STEVE KASTE d/b/a
STEVE'S SPORTS CENTER,

      Defendants and Respondents.

_____

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. BDV-05-031,
The Honorable Julie Macek, Presiding Judge.

COUNSEL OF RECORD:

      For Appellants:

            Gary M. Zadick and Mark F. Higgins, Ugrin, Alexander, Zadick &
Higgins, Great Falls, Montana

      For Respondents:

            Kelly J.C. Gallinger and Lisa A. Speare, Brown Law Firm, P.C., Billings,
Montana

_____

Submitted on Briefs:  October 3, 2006
Decided:  March 13, 2007

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 William Brian Boettcher and Carol Boettcher (collectively the Boettchers) appeal from an order of the Eighth Judicial District, Cascade County, granting summary judgment in favor of Montana Insurance Guaranty Association (MIGA), Western Guaranty Fund Services (Western Guaranty), and James Reed (Reed). Defendant Steve Kaste (Kaste) does not join this appeal. We affirm in part and reverse in part.

¶2 The Boettchers present the following issues for appeal:

¶3 1. Whether § 33-10-110, MCA, grants MIGA immunity from liability arising out of statutory and common law claims of bad faith.

¶4 2. Whether § 33-10-110, MCA, extends immunity to Western Guaranty and Reed for statutory and common law claims of bad faith.

¶5 3. Whether § 33-10-110, MCA, violates substantive due process.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 William Brian Boettcher fell from a loft and shattered both heels while painting Kaste's commercial building on July 26, 2001. Legion Insurance Company (Legion) insured Kaste at the time of the accident with a $1 million policy for commercial auto and property coverage. The Boettchers filed claims against the Legion policy seeking compensation for their injuries. Legion became insolvent before resolving the Boettchers' claims.

¶7 The Boettchers' claims transferred to MIGA upon Legion's insolvency. The Boettchers improperly refer to MIGA as the Montana Guaranty Fund in the caption of their appeal. MIGA is the nonprofit association of insurance companies statutorily

2

created to provide a mechanism for payment of covered claims to avoid financial loss to claimants or policyholders because of the insolvency of an insurer. Western Guaranty is a nonprofit organization that performs claims handling for MIGA. Reed worked for Western Guaranty and handled the Boettchers' claims.

¶8 The Boettchers filed a complaint for declaratory relief in the Eighth Judicial District, Cascade County on January 10, 2005. The Boettchers allege that MIGA, Western Guaranty, and Reed failed to settle their claims in a reasonable manner. The Boettchers requested that the District Court issue a declaratory ruling that: 1) MIGA has all the rights, duties, and obligations of the insolvent insurer including statutory and common law obligations of good faith owed to an insured and to a third party under the Montana Insurance Guaranty Association Act (the Act); 2) the limitation of liability afforded MIGA under the Act applies only to its obligations within the policy limits of the insolvent insurer and not to the "extra-contractual" liability involving violations of statutory and common law principles of good faith and fair dealing; 3) statutory or common law limitations of liability do not extend to any entity or person hired to administer claims on behalf of MIGA; and 4) any immunity from any "extra-contractual" liability granted to MIGA violates equal protection and due process under the state and federal constitutions. MIGA, Western Guaranty, and Reed denied the Boettchers' claims for declaratory relief in an answer filed on February 25, 2005.

¶9 The Boettchers filed a motion for summary judgment on July 22, 2005, specifically challenging § 33-10-110, MCA, the statute that insulates MIGA from any liability relating to acts performed within its duties. MIGA, Western Guaranty, and Reed

3

also filed a motion for summary judgment on July 25, 2005. The Boettchers acknowledged that they had received the statutory maximum claim of $300,000 allowed under MIGA. They argued, however, that Montana law entitled them to pursue recovery of the expenses that they incurred in forcing MIGA, Western Guaranty, and Reed to pay the $300,000. The Boettchers asserted that MIGA, Western Guaranty, and Reed withheld payment and caused a two-year delay and unnecessary litigation in settling their claims.

¶10 The District Court granted summary judgment in favor of MIGA, Western Guaranty, and Reed. The court concluded that MIGA's rights, duties, and responsibilities extend only to "covered claims," not including statutory and common law obligations of good faith owed to an insured and a third-party claimant. The court determined that the 2001 version of § 33-10-110, MCA, protected MIGA from statutory and common law good faith and fair dealing claims and that such immunity extended to Western Guaranty and Reed for acts performed on behalf of MIGA. The court concluded that the immunity statute does not violate substantive due process rights under the Fourteenth Amendment of the United States Constitution or Article II, Section 4, of the Montana Constitution. The Boettchers appeal.

**STANDARD OF REVIEW**

¶11 We review *de novo* the district court's grant of summary judgment. *Petroleum Tank Release v. Capitol Indem.,* 2006 MT 133, ¶ 12, 332 Mont. 352, ¶ 12, 137 P.3d 522, ¶ 12. If no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. *Petroleum Tank Release,* ¶ 12. Accordingly,

4

we review the district court's legal determinations to establish whether the conclusions were correct. *Petroleum Tank Release,* ¶ 12.

## DISCUSSION

¶12 *Whether § 33-10-110, MCA, grants MIGA immunity from liability arising out of statutory and common law claims of bad faith.*

¶13 The Boettchers concede that § 33-10-110, MCA, cloaks MIGA with immunity from liability arising out of actions taken in the performance of its powers and duties. The Boettchers argue that MIGA acted outside of its statutory duty in failing to reasonably settle their claims, and thus the immunity provision cannot protect MIGA from liability arising out of bad faith claims. The Boettchers contend that § 33-10-105(1)(b), MCA, implicitly requires MIGA to settle claims reasonably under the Unfair Trade Practices Act (UTPA), embodied in Title 33, Chapter 18, MCA. The Boettchers argue that any breach of that duty gives rise to both a common law cause of action for bad faith and a statutory cause of action under § 33-18-242, MCA.

### The Act (2001) versus the Act (2005)

¶14 As a preliminary matter, we must determine whether to apply the 2001 version of the Act or the amended 2005 version. We determine the substantive rights between the parties according to the law in effect at the date of injury. *Anderson v. Werner Enterprises, Inc.*, 1998 MT 333, ¶ 28, 292 Mont. 284, ¶ 28, 972 P.2d 806, ¶ 28. The Boettchers urge us to apply the 2001 version of the Act, because the claims handling practices in question occurred before the Legislature amended the Act on March 18, 2005.

5

¶15     MIGA concedes that the 2001 version of the Act constituted the law at the time of Boettcher's underlying injury related to his fall from the loft.  MIGA argues nevertheless that the 2005 version of the Act should govern any potential third party claims that the Boettchers may have against MIGA.  MIGA bases its contention on the fact that the underlying claim settled on October 6, 2005, when the parties executed an assignment of claims document.  MIGA contends that the October settlement signified the proper time for filing a third party action under § 33-18-242(6), MCA, and, therefore, the law in effect at the time that the claims could be filed under the UTPA should control which version of the Act applies to the Boettchers' claims.

¶16     MIGA's position disregards our longstanding rule, however, to apply the law in effect at the date of the injury.  *Anderson*, ¶ 28.  For purposes of the Boettchers' potential common law bad faith claim, the alleged tortious conduct began when MIGA, Western Guaranty, and Reed handled and supposedly unreasonably rejected the Boettchers' first demand for payment.  All elements of the tort existed upon the alleged unreasonable refusal to pay.  *Brewington v. Employers Fire Insurance Co.*, 1999 MT 312, ¶ 29, 297 Mont. 243, ¶ 29, 992 P.2d 237, ¶ 29.

¶17     Similar reasoning applies to the Boettchers' potential statutory bad faith claim pursuant to the UTPA.  The injuries in this case, if any, took place when MIGA, Western Guaranty, and Reed failed to handle the Boettchers' claims in a reasonable manner.  Section 33-18-242(1), MCA.  This first alleged failure took place when the Boettchers made a demand for payment from MIGA before the Legislature amended the Act in 2005.  Any claim processing restrictions imposed under § 33-18-242(6)(b), MCA, do not

6

alter the fact that the Boettchers' alleged injuries in this case occurred when MIGA, Western Guaranty, and Reed handled and allegedly unreasonably rejected the Boettchers' demands for payment. These alleged injuries occurred when the 2001 Act controlled.

¶18 The Boettchers further contend that § 33-10-110, MCA, as amended in 2005, contains no express provision on retroactivity and, therefore, the amended statute can be applied only prospectively. We will not apply a statute retroactively unless the Legislature clearly expresses its intention of such retroactive application. *Anderson*, ¶ 28. Nothing in the face of the 2005 version of § 33-10-110, MCA, indicates that the Legislature intended for the amended statute to be applied retroactively. We apply the 2001 version of the Act in light of the fact that the Boettchers' alleged injuries occurred before the Legislature enacted the 2005 amendments.

## Application of the Act (2001)

¶19 We consider whether § 33-10-110, MCA (2001), grants MIGA immunity from bad faith claims. We seek to implement the objectives that the Legislature sought to achieve in interpreting statutes. *Mont. for Justice v. State ex. rel. McGrath*, 2006 MT 277, ¶ 60, 334 Mont. 237, ¶ 60, 146 P.3d 759, ¶ 60. The plain language of the statute controls our interpretation if the legislative intent can be determined from the plain meaning of the words used. *Mont. for Justice*, ¶ 60. We must "interpret individual sections of an act in such a manner as to ensure coordination with the other sections of the act." *Howell v. State*, 263 Mont. 275, 286, 868 P.2d 568, 574 (1994).

¶20 Section 33-10-110, MCA, provides that there is no liability on the part of, and that no cause of action of any nature may be brought against "any member insurer, the

7

association or its insurance producers or employees, the board of directors, or the commissioner or his representatives . . . ." This immunity applies to "any action taken by them in the performance of their powers and duties under this part." Section 33-10-110, MCA.

¶21 We considered in *Howell*, 263 Mont. at 286, 868 P.2d at 575, whether MIGA enjoyed immunity under § 33-10-110, MCA (2001), from a claim of attorney fees. We determined that the statute on its face could be read to insulate MIGA from "any liability," including MIGA's statutory obligation to pay "covered claims" under § 33-10-105, MCA. We declined to apply the provision so broadly, however, in light of the Act's primary purpose of "avoiding financial loss to claimants or policyholders by the insolvency of an insurer . . . ." *Howell*, 263 Mont. at 287, 868 P.2d at 575; *See* § 33-10-101, MCA.

¶22 We determined that MIGA maintained a statutory duty to pay only "covered claims" under § 33-10-105, MCA. *Howell*, 263 Mont. at 287, 868 P.2d at 575. A "covered claim" means "an unpaid claim, including one for unearned premiums, that arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this part applies . . . ." Section 33-10-102(2)(a), MCA. We concluded that the Legislature, by enacting § 33-10-110, MCA (2001), intended to preclude liability against MIGA for claims other than "covered claims," such as claims for attorney fees. *Howell*, 263 Mont. at 287, 868 P.2d at 575.

¶23 The Boettchers attempt to distinguish *Howell* by arguing that the Court addressed only attorney fees and not claims of bad faith. The Boettchers ignore the fact that, in

8

deciding to preclude an action against MIGA for recovery of attorney fees, we relied on the reasoning in decisions from four other states that prevented bad faith actions against an insurance guaranty association. *Howell*, 263 Mont. at 287-88, 868 P.2d at 575-76.

¶24 For instance, we considered a Missouri appellate court's decision in *Pannell v. Missouri Ins. Guar. Ass'n*, 595 S.W.2d 339 (Mo. App. 1980), to preclude a "vexatious refusal to pay" action against the Missouri Insurance Guaranty Association based on a similar statutory immunity provision and the guaranty association's authority to pay only covered claims. *Howell*, 263 Mont. at 287, 868 P.2d at 575. We cited a Washington decision that concluded that bad faith did not constitute a covered claim and, therefore, the guaranty association could not be held liable for such damages. *Howell*, 263 Mont. at 287, 868 P.2d at 575, citing *Vaughn v. Vaughn*, 597 P.2d 932 (Wash. App. 1979). We also looked to *Isaacson v. California Ins. Guaranty Ass'n*, 750 P.2d 297 (Cal. 1988), wherein the Supreme Court of California held that the insurance guaranty association stands in the shoes of the insolvent insurer only to the extent of covered claims and not tort claims relating to claims handling practices. *Howell*, 263 Mont. at 288, 868 P.2d at 575. Based on the reasoning of those cases, we concluded in *Howell* that MIGA could not be held liable for claims that do not constitute a "covered claim" under § 33-10-102, MCA.

¶25 The Boettchers urge the Court to limit the holding in *Howell* as simply excluding claims for attorney fees from a "covered claim." They urge us instead to adopt the reasoning in *Washington Ins. Guar. Assn. v. Ramsey*, 922 P.2d 237 (Alaska 1996), for bad faith claims against MIGA. The Alaska Supreme Court in *Ramsey* determined that

9

Washington Insurance Guaranty Association (WIGA) did not enjoy immunity from bad faith liability under the Washington immunity provision, because its failure to settle a claim in good faith constituted an action outside of its statutory duty. *Ramsey*, 922 P.2d at 243. The *Ramsey* court reasoned that if WIGA maintained the statutory duty to settle claims reasonably, then "such a refusal is not in accordance with WIGA's statutory duties, and therefore WIGA cannot claim immunity from liability based on that refusal." *Ramsey*, 922 P.2d at 243.

¶26 MIGA counters that we should reject the *Ramsey* decision based on our decision in *Howell* and the reasoning of *Hudson Environmental v. NJ PLIGA*, 858 A.2d 39 (N.J. Super. 2004), and *Bills v. Arizona Prop. and Cas. Ins. Guaranty Fund*, 984 P.2d 574 (Ariz. App. 1999). The New Jersey court in *Hudson* faced the same question presented here: whether the immunity provision contained in the state's insurance guaranty association act precluded bad faith actions against the insurance guaranty association. The court rejected the Alaska court's "narrow" reading of the immunity provision, stating that such interpretation "turns the immunity provision into a sieve, immunizing [the insurance guaranty association] only when its agents or employees committed no wrong and had little need for protection." *Hudson*, 858 A.2d at 54. The *Hudson* court also cited to dicta in *Bills*, where the Arizona court reached a similar conclusion, stating that "'to accept plaintiff's contention that statutory immunity is automatically unavailable [when bad faith is alleged] would completely dilute, if not altogether eliminate' the immunity provision." *Hudson*, 858 A.2d at 54 (quoting *Bills*, 984 P.2d at 579). The *Hudson* court

10

rejected *Ramsey*, explaining that its holding provided immunity to the insurance guaranty association only when its exposure to liability is virtually non-existent.

¶27  The *Hudson* court determined the scope of immunity provided under the New Jersey insurance guaranty association act by examining the plain language of the immunity provision.  The court focused on the statute's phrase that the insurance guaranty association is immune from liability for an "action . . . taken . . . in the performance of . . . powers and duties under this act."  *Hudson*, 858 A.2d at 55.  The court determined that the insurance guaranty association's "powers and duties" under the act encompassed only those actions incidental to claims adjustment, processing, and payment on covered claims.  *Hudson*, 858 A.2d at 55.  The court concluded, therefore, that the immunity provision protected the guaranty insurance association from liability arising out of its powers and duty to adjust, process, and pay covered claims, such as claims of bad faith.

¶28  The key distinction between *Hudson* and *Ramsey* rests on how the courts defined the insurance association's "powers and duties" under the immunity provision.  The *Hudson* court looked to the state's insurance guaranty association act "as a whole" to determine the extent of the association's immunity from liability arising out of claims of bad faith.  *Hudson*, 858 A.2d at 52.  The *Ramsey* court by contrast relied on parts of the state's insurance guaranty association act read in conjunction with Washington's common law duties of good faith placed on ordinary insurers to determine the extent of WIGA's duties to pay covered claims.  *Ramsey*, 922 P.2d at 243.

11

¶29 The Boettchers ask us to undertake the reasoning in *Ramsey* because their claims rest on the statutory duties contained in the Act and the Unfair Trade Practices Act. The plain language of § 33-10-110, MCA, however, prevents us from doing so. The statute precludes liability on the part of MIGA, "for any action taken by [it] in the performance of [its] powers and duties *under this part*." Section 33-10-110, MCA (emphasis added). The plain meaning of the words "under this part" directs us to look within the Act to determine what constitutes actions taken in the performance of MIGA's powers and duties for the purposes of determining the scope of immunity.

¶30 Section 33-10-105, MCA, expressly provides MIGA's "general powers and duties," including MIGA's primary duty to pay "covered claims" arising out of an insurance policy issued by an insolvent insurer that remained unpaid prior to the insolvency. *See* § 33-10-105(1)(a)(i), MCA. To this end, MIGA "is considered the insurer to the extent of its obligation on the covered claims and to that extent has all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Section 33-10-105(1)(b), MCA.

¶31 The Boettchers argue that the language in § 33-10-105(1)(b), MCA, that MIGA carries "all the rights, duties, and obligations of the insolvent insurer . . . ," implicitly requires the Court to consider the duties of good faith imposed on an insurer under the Unfair Trade Practices Act. The Boettchers overlook the fact that MIGA stands in the shoes of the insolvent insurer only to the extent of "its obligation on the covered claims." Section 33-10-105(1)(b), MCA. MIGA fulfilled its obligations under § 33-10-105(1)(b), MCA, by paying the statutory cap of $300,000 on the covered claims in this case.

12

¶32 The Boettchers could have maintained an action to force MIGA to perform its statutory obligation to pay on the covered claims up to the $300,000 statutory limit stated in § 33-10-105(1)(a)(ii), MCA. We have refused to interpret the immunity granted by § 33-10-110, MCA, so broadly as to prevent an action that seeks to force MIGA to provide the service it was statutorily created to do—pay covered claims under the insurance policy. *Howell*, 263 Mont. at 287, 868 P.2d at 575. We determined in *Howell* that a claim of attorney fees did not constitute a covered claim for the purposes of maintaining suit against MIGA. *Howell*, 263 Mont. at 288, 868 P.2d at 576. Likewise, an action for bad faith, whether sounding in tort or statutorily based, falls outside the definition of "covered claims" in § 33-10-102(2)(a), MCA. Moreover, bad faith claims arise out of actions taken by MIGA in performance of its statutory duty within the Act to pay such covered claims. Section 33-10-110, MCA, specifically bars such claims.

¶33 This conclusion furthers the Act's stated purposes to "provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer . . . ." Section 33-10-101(2), MCA. Reading the Act as a whole reflects the Legislature's intent to carry out the purpose of the Act by providing limited recovery to insureds. For instance, § 33-10-105, MCA, limits MIGA's duties to paying only covered claims as defined in the Act. Section 33-10-105(2)(a)(ii), MCA, caps such payments to $300,000 per covered claim. Section 33-10-115, MCA, requires insureds to collect payment under other policies carried by solvent insurers before turning to MIGA.

¶34 We must construe these provisions "liberally" so as to give effect to the purpose of the Act. *See* § 33-10-101(4), MCA. In light of the Act's purpose to provide limited recovery, we interpret § 33-10-110, MCA, as protecting MIGA from liability arising from bad faith actions, whether grounded in tort or statutorily based, as such liability arises out of MIGA's actions in the performance of its duties to pay covered claims. We affirm the District Court's Order granting summary judgment in MIGA's favor.

¶35 *Whether § 33-10-110, MCA, extends immunity to Western Guaranty and Reed.*

¶36 The Boettchers argue that Western Guaranty and Reed remain unprotected by § 33-10-110, MCA (2001), for two reasons. The Boettchers first assert that nothing in the plain language of the statute extends immunity to MIGA's agents, such as Western Guaranty and its employee Reed. The 2001 statute provides immunity to "the association or its insurance producers or employees." Section 33-10-110, MCA. Second, the Boettchers argue that the Legislature's 2005 amendment to § 33-10-110, MCA, to extend immunity explicitly to MIGA's agents confirms that the 2001 statute failed to protect Western Guaranty and Reed from liability at the time the Boettchers filed their claims.

¶37 The plain language of § 33-10-110, MCA (2001), provides protection from liability to a specific class of people or organizations involved with MIGA. Those protected under the statute include: "any member insurer, the association or its insurance producers or employees, the board of directors, or the commissioner or his representatives . . . ." Section 33-10-110, MCA. Montana's original version of the immunity provision, enacted in 1971, expressly granted immunity to MIGA's "agents."

14

The original statute parallels immunity provisions protecting insurance guaranty associations and their "agents" in Nevada, Washington, Arizona, California, and Florida. *See Nevada Ins. Guaranty v. Sierra Auto Center*, 844 P.2d 126 (Nev. 1992); *Ramsey*, 922 P.2d 237; *Wells Fargo Cr. v. Arizona Prop. & Cas.*, 799 P.2d 908 (Ariz. App. 1990); *Jones v. Florida Ins. Guar. Ass'n, Inc.*, 908 So.2d 435 (Fla. 2005). Our Legislature deleted the word "agent," however, from the entire insurance code in 1989, and inserted instead the term "insurance producers."

¶38 Western Guaranty and Reed argue that they remain protected under the 2001 statute regardless of Legislature's change of terms in 1989. Western Guaranty and Reed assert that the Legislature contemplated that MIGA would delegate its powers and duties to another organization under its authority in § 33-10-106, MCA. Western Guaranty and Reed contend that the legislative history behind § 33-10-110, MCA, shows the Legislature's intent to cloak those entities and their employees with the same immunity granted to MIGA.

¶39 The legislative history behind the 1989 amendments indicates that the Legislature changed the terminology to correspond with industry language and to streamline Montana's insurance licensing requirements with the licensing requirements of other states. The shift from "agent" to "insurance producer" effectively required an agent to have an insurance license, and thus any revocation of a license in Montana could be recognized by other states. Likewise, the change allowed Montana to enforce license revocations imposed by other states operating under the multi-state licensing model. Nothing in the legislative history discusses the effect of the change in language to the

15

Act, although such changes affected the entirety of the Act. House Comm. on Business and Economic Development, *Hearing on H.B. 734*, (Feb. 17, 1989); Sen. Comm. On Business and Industry, *Hearing on H.B. 734*, (Mar. 10, 1989).

¶40 Western Guaranty and Reed assert that the Legislature's 1989 amendment constituted a housekeeping measure that sought to align Montana's code with insurance provisions in other states. They argue that the Legislature, although changing the terms from "agents" to "insurance producers," never intended to abandon its original objective to provide immunity to MIGA's agents. Western Guaranty and Reed assert that the 2005 amendment reintroducing the term "agent" into § 33-10-110, MCA, simply clarified a pre-existing right of immunity.

¶41 Our review of the legislative history behind the 2005 amendment shows, however, that the change in language "extends" immunity to MIGA's agents. House Comm. on Business and Labor, *Hearing on H.B. 168*, (Jan. 12, 2005); Sen. Comm. On Business, Labor, and Economic Affairs, *Hearing on H.B. 168*, (Mar. 4, 2005). The 2005 amendment and the accompanying legislative history convince us that the previous version of the statute failed to protect MIGA's agents from liability. No amendment would have been necessary otherwise.

¶42 We must construe the 2001 statute as written. *Mont. for Justice*, ¶ 60. An "insurance producer," means "a person who solicits, negotiates, effects, procures, delivers, renews, continues, or binds" policies of insurance for risks residing, located, or to be performed in this state. Section 33-17-102(9)(a)(i), MCA. Section 1-2-101, MCA, forbids this Court from inserting the term "agent" into the statute where the Legislature

16

intentionally deleted it and replaced it with the term "insurance producer." Western Guaranty and Reed, as agents of MIGA, do not perform any of the specified functions of an "insurance producer" as defined by the 2001 statute. Western Guaranty and Reed do not solicit, negotiate, effect, or procure policies of insurance. Western Guaranty and Reed likewise do not deliver, renew, continue, or bind policies of insurance. Western Guaranty and Reed handle claims for MIGA on policies originally sold by insolvent insurers.

¶43 Western Guaranty and Reed also do not qualify as employees of MIGA or any other parties so as to warrant their protection under the 2001 version of § 33-10-110, MCA. Title 33 of the Montana Code does not specifically define "employee." In the absence of a specific definition, we have employed the "common sense interpretation" as meaning "those engaged in the services for wages and salary by another." *Farmers Union Mut. Ins. Co. v. Horton*, 2003 MT 79, ¶ 18, 315 Mont. 43, ¶ 18, 67 P.3d 285, ¶ 18. Western Guaranty is a voluntary, nonprofit organization created by MIGA and five insurance guaranty associations from other states for the purposes of carrying out the statutory duties under the states' respective insurance guaranty association acts. Western Guaranty performs services for MIGA in exchange for its operating costs, not for "wages and salaries" as required by the common definition of the word "employee." Thus, Western Guaranty does not qualify as an employee of MIGA as contemplated by the immunity provision of the 2001 Act. Similarly, Reed presumably serves as an employee of Western Guaranty. The 2001 Act extends no immunity to Western Guaranty and thus cannot extend immunity to Reed as an employee of Western Guaranty. We conclude,

17

therefore, that the District Court erred in granting summary judgment in favor of Western Guaranty and Reed. We reverse and remand to the District Court for further proceedings on the issue of common law and statutory claims of bad faith involving Western Guaranty and Reed's handling of the Boettchers' claims.

¶44 *Whether § 33-10-110, MCA, violates substantive due process.*

¶45 The Boettchers challenge the constitutionality of § 33-10-110, MCA, on grounds that the law violates substantive due process. We already have determined that M. R. App. P. 38 precludes this Court from considering the Boettchers' constitutional arguments. *See Boettcher v. Montana Guar. Fund (Boettchers I)*, 2006 MT 127, ¶¶ 12-29, 332 Mont. 279, ¶¶ 12-29, 140 P.3d 474, ¶¶ 12-29.

¶46 M. R. App. P. 38 requires a party to give written notice to this Court and the Montana attorney general of a constitutional challenge in an action where the state is not a party. Such notice "shall be given contemporaneously with the filing of the notice of appeal or with the filing of an original proceeding in the supreme court." M. R. App. P. 38. The Boettchers' failure to file contemporaneous notice of their constitutional question as required by M. R. App. P. 38 precludes our consideration of the Boettchers' constitutional arguments on appeal. *Boettchers I*, ¶¶ 12-29.

## CONCLUSION

¶47 We affirm the District Court's Order granting summary judgment in favor of MIGA on the grounds that § 33-10-110, MCA, protected it from liability arising from statutory and common law claims of bad faith. We reverse the District Court's Order granting summary judgment in favor of Western Guaranty and Reed and remand for

18

further proceedings on the issue of Western Guaranty and Reed's liability related to the

Boettchers' statutory and common claims of bad faith.


/S/ BRIAN MORRIS


We Concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ JOHN WARNER