

DA 07-0375

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 288

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

KENNETH EUGENE MERRY,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Seventh Judicial District,
In and For the County of McCone, Cause No. DC 06-05
Honorable Katherine M. Irigoin, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Robert J. Savage; The Savage Law Firm; Sidney, Montana

      For Appellee:

      Hon. Mike McGrath, Montana Attorney General; J. Stuart Segrest,
Assistant Attorney General; Helena, Montana

      Kendall Link, McCone County Attorney; Circle, Montana

Submitted on Briefs:  May 14, 2008

Decided:  August 12, 2008

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     Kenneth Eugene Merry (Merry) appeals from his conviction in the Seventh Judicial District, McCone County, of driving under the influence of alcohol (DUI). We affirm.

¶2     We restate the issues as follows:

¶3     Did the District Court err when it denied Merry's motion to suppress the results of his blood alcohol test on the grounds that the sample was collected in violation of § 61-8-405(1), MCA?

¶4     Does the Health Center's policy unlawfully allow LPNs to conduct blood draws without the supervision and direction of a physician or registered nurse?

¶5     Do violations of the Health Center's policy demonstrate that Bailey was not an "other qualified person acting under the supervision and direction of a physician or registered nurse" as required by § 61-8-405(1), MCA?

¶6     Did the District Court err when it used Merry's failure to controvert his implied consent to support its ruling?

**BACKGROUND**

¶7     On March 26, 2006, at approximately 2:30 a.m., McCone County Sheriff's Deputy Marc Speer observed Merry commit several traffic infractions, including driving on the wrong side of the street, failing to stop at three different stop signs, and stopping in the middle of the street although he had the right of way. Deputy Speer stopped Merry and began a DUI investigation. Deputy Speer decided not to conduct standard field sobriety

2

tests due to Merry's difficulties with walking and maintaining his balance. Merry provided Deputy Speer a breath sample, which indicated that Merry had an alcohol concentration of .136. Merry also agreed to provide a blood sample. Deputy Speer transported Merry to the McCone County Health Center (the Health Center), where Tina Bailey, the licensed practical nurse (LPN) on duty, conducted Merry's blood draw at Deputy Speer's request. A registered nurse (RN) and a physician's assistant were on call, but were not physically present in the Health Center.

¶8 The State charged Merry with DUI after receiving the results of Merry's blood alcohol test, which indicated that Merry had an alcohol concentration of .14. Merry filed a motion to suppress the results of the test, arguing that Bailey was not statutorily authorized to draw blood to detect the presence of alcohol. The Justice Court denied Merry's motion. Merry then pleaded guilty to DUI, but specifically reserved the right to appeal the admissibility of the blood test. Merry appealed the Justice Court's ruling to the District Court and moved to suppress the result of the blood test. The District Court denied Merry's motion to suppress after considering the parties' briefs and hearing oral argument. Merry now appeals.

**STANDARD OF REVIEW**

¶9 We review a district court's denial of a motion to suppress to determine whether the district court's findings of fact are clearly erroneous and whether the district court's conclusions of law are correct. *State v. Zakovi*, 2005 MT 91, ¶ 9, 326 Mont. 475, ¶ 9, 110 P.3d 469, ¶ 9.

3

**DISCUSSION**

¶10 **I Did the District Court err when it denied Merry's motion to suppress the results of his blood alcohol test on the grounds that the sample was collected in violation of § 61-8-405(1), MCA?**

¶11 Merry contends that the District Court erred when it concluded that Bailey was acting under the supervision and direction of a physician or RN when she drew his blood. Merry maintains that Bailey was not acting under the supervision and direction of a physician or RN, as required by § 61-8-405, MCA, because neither a physician nor an RN was physically present at the Health Center.

¶12 The District Court's interpretation of § 61-8-405, MCA, presents a conclusion of law which we review for correctness. *State v. Price*, 2002 MT 150, ¶ 15, 310 Mont. 320, ¶ 15, 50 P.3d 530, ¶ 15. When interpreting statutes, we seek to implement the Legislature's objectives. *Boettcher v. Montana Guar. Fund*, 2007 MT 69, ¶ 19, 336 Mont. 393, ¶ 19, 154 P.3d 629, ¶ 19. The statute's plain language controls our interpretation if we can discern the legislative intent from the plain meaning of the statute's words. *Boettcher*, ¶ 19. Further, we refuse to insert "what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. The definition of a statutorily defined term applies throughout the Montana Code unless "a contrary intention plainly appears." Section 1-2-107, MCA.

¶13 Section 61-8-405, MCA, governs the administration of blood tests and provides that only a physician, registered nurse, or "other qualified person acting under the

4

supervision and direction of a physician or registered nurse," may withdraw blood to determine the presence of alcohol and drugs. Though Merry claims to dispute that Bailey is a "qualified person," Merry raises no challenges to Bailey's qualifications on appeal. Further, Merry's briefing to the District Court reveals that he regarded Bailey as a qualified person within the meaning of § 61-8-405(1), MCA. For this appeal, we accept without deciding that Bailey, as an LPN, is an "other qualified person" as contemplated by § 61-8-405(1), MCA.

¶14 Merry argues that Bailey was not acting under the supervision and direction of a physician or RN because neither a physician nor an RN was physically present at the Health Center. According to Merry, the plain language of § 61-8-405(1), MCA, clearly and unambiguously requires the physical presence of a physician or an RN for a blood draw administered by an "other qualified person" to be proper. Merry contends that the District Court erred in relying on statutes related to other healthcare professions to interpret the meaning of supervision and direction. The State counters that the legislative history of § 61-8-405, MCA, and this Court's precedent support a more "general" view of supervision and direction. The State further argues that the purpose of the statute was satisfied in this case because Bailey was under the supervision of an on-call RN.

¶15 Section 61-8-405, MCA, does not define the terms "supervision and direction." Definitions for "direct supervision," "general supervision," and "qualified medical direction" appear in other sections of the Montana Code Annotated; however, in each instance, the Legislature has constrained the applicability of the definitions to particular

5

sections of the Code. For example, sections relating to dental hygienists and hearing aid dispenser trainees state that the definitions apply for "the purposes of this section" and the section relating to respiratory care states that the definition is applicable "[a]s used in this chapter." Sections 37-4-405, 37-16-405, and 37-28-102, MCA. The Legislature plainly has limited the reach of these definitions, and thus, they cannot properly define the terms of § 61-8-405(1), MCA. Section 1-2-107, MCA.

¶16 As the phrase "acting under the supervision and direction" is undefined, we look to the plain meaning of the statute's words to discern the legislative intent. *Boettcher*, ¶ 19. The plain meaning of the word "under," as used in the statute means "[s]ubject to the authority, rule or control of: *under a dictatorship*. . . . Subject to the supervision, instruction, or influence of: *under parental guidance*." *American Heritage Dictionary of the English Language* 1874 (4th ed. Houghton Mifflin Co. 2000). "Supervision" is defined as the "act, process, or function of supervising" and "supervise" means to "have the charge and direction of; superintend." *American Heritage Dictionary of the English Language* at 1738-39. "Direction" means "[m]anagement, supervision, or guidance of an action or operation. . . . An authoritative indication; an order or a command." *American Heritage Dictionary of the English Language* at 512. We disagree with Merry that § 61-8-405(1), MCA, clearly and unambiguously requires the physical presence of a physician or RN for a blood draw administered by an "other qualified person" to be proper. The definitions set forth above do not resolve whether § 61-8-405(1), MCA, requires the

physical presence of a physician or RN; the plain meaning of the statute's words is broad enough to encompass both the State's and Merry's interpretations.

¶17  We turn to a statute's legislative history to determine its correct interpretation when we cannot discern the Legislature's intent from the statute's plain language. *Stockman Bank of Montana v. Mon-Kota, Inc.*, 2008 MT 74, ¶ 17, 342 Mont. 115, ¶ 17, 180 P.3d 1125, ¶ 17.  Prior to 1981, § 61-8-405, MCA, authorized only physicians and RNs to draw blood to determine the presence of alcohol.  The 1981 amendment allowed "other qualified person[s] under the supervision and direction of a physician or registered nurse" to draw blood.  Section 61-8-405, MCA (1981).  Unfortunately, the committee minutes do not specify whether the Legislature contemplated that "supervision and direction" would require the actual physical presence of a physician or RN or something more general.

¶18  The committee minutes do indicate, however, that § 61-8-405, MCA, was amended to expand the category of persons who permissibly could conduct a blood test, and thus, to facilitate DUI prosecutions.  The committee members heard testimony that blood tests were being challenged because lab technicians conducted blood draws, rather than a physician or RN.  Mont. H. Jud. Comm., *Hearing on SB 111*, 47th Leg., Reg. Sess. 3 (Mar. 5, 1981).  Committee members also learned that the individuals who perform the blood draws generally are lab technicians.  The bill's proponents informed the committee that the amended language would remove evidentiary challenges to blood tests which were not performed by a physician or an RN.  Mont. H. Jud. Comm., *Hearing on SB 111*,

at 3. Senator Stimatz, who introduced the bill at the request of the Department of Justice (DOJ), indicated that "qualified persons, such as laboratory technicians" should be "allowed to take blood samples to determine alcohol level of the blood." Mont. Sen. Jud. Comm., *Hearing on SB 111*, 47th Leg., Reg. Sess. 1 (Jan. 19, 1981). Similarly, Representative Daily, who presented the bill in the House, stated that the amendment would "allow a person other than a doctor or a registered nurse to draw blood. A lab technician who specializes in this could withdraw the blood." Mont. H. Jud. Comm., *Hearing on SB 111*, at 2. Notably, neither Senator Stimatz nor Representative Daily hinged the lab technician's ability to draw blood on the physical presence of a physician or RN. Further, Senator Mazurek questioned whether "even broader language in determining who was qualified to draw a blood sample might be helpful." Mont. Sen. Jud. Comm., *Hearing on SB 111*, at 1-2. DOJ spokesman Larry Majerus responded that the main intent of the amendment was "to allow the medical technicians to be included" as persons qualified to draw blood samples, but that it was not intended to "take the process out of the hospital environment where such qualified persons would not be available." Mont. Sen. Jud. Comm., *Hearing on SB 111*, at 2.

¶19   Given the overall purpose of the amendment, the apparent willingness of the Senate Judiciary Committee to consider even broader language in the statute, and the discussion of laboratory technicians' ability to draw blood with no mention of a specific level of supervision and direction, we conclude that the Legislature contemplated a more general level of "supervision and direction" than that suggested by Merry. Adopting

8

Merry's interpretation would require us to insert the terms "onsite" or "direct" to qualify the "supervision and direction" requirement, and thus, to insert what the Legislature omitted. As the Legislature has not limited "supervision and direction" to onsite or direct supervision, we conclude that a physician's or RN's physical presence is not required and that a qualified person who draws blood while subject to offsite or on-call supervision can satisfy the statutory requirement that the person be "acting under the supervision and direction of a physician or registered nurse . . . ." Section 61-8-405(1), MCA.

¶20 Our conclusion that § 61-8-405(1), MCA, does not require the physical presence of a physician or RN finds support in other statutory provisions involving supervision and direction in the healthcare arena. For example, § 37-4-405, MCA, allows a dental hygienist to practice under a licensed dentist's supervision. The statute differentiates between "direct supervision" and "general supervision" and provides that treatment requiring direct supervision "must be performed while the dentist is on the premises" while treatment falling under general supervision does not require the dentist to be on the premises. Section 37-4-405, MCA. Similarly, § 37-16-405, MCA, requires a trainee who is licensed to dispense hearing aids to "work under the direct supervision of the sponsoring licensed hearing aid dispenser." In this context, "'direct supervision' means the direct and regular observation and instruction of a trainee by a licensed hearing aid dispenser who is available at the same location for prompt consultation and treatment." Section 37-16-405(8), MCA. Statutes regulating physical therapists and physician assistants also detail when direct or onsite supervision is required. *See* § 37-11-105,

9

MCA, and § 37-20-403, MCA. Though we do not use these statutes to define the terms of § 61-8-405, MCA, these statutes demonstrate that the Legislature drafts with specificity when it intends to require direct or onsite supervision and direction.

¶21 Moreover, to require the physical presence of a physician or RN when the blood sample is withdrawn renders useless the provision allowing "other qualified persons" to take the blood sample; if the physician's or RN's presence is required, the physician or RN could simply perform the blood draw. Such a limited reading contradicts the purpose of the amendment and renders the "other qualified person acting under the supervision and direction of a physician or registered nurse" language moot. Section 61-8-405(1), MCA.

¶22 Our conclusion that a physician's physical presence is not required under § 61-8-405(1), MCA, is also consistent with *Zakovi*. In *Zakovi*, we determined that a phlebotomist conducted a blood draw in accordance with § 61-8-405(1), MCA, because she was "continuously under the supervision of a registered nurse on duty in the emergency room, *as* her position is subordinate and requires compliance with the registered nurse's orders under hospital policy." *Zakovi*, ¶ 36 (emphasis added). Though the RN in *Zakovi* was apparently present at the St. Peter's Hospital complex in Helena, we focused on the phlebotomist's subordinate position and the requirement that the phlebotomist follow the RN's orders, rather than on the physical presence of the RN.

¶23 In this case, the District Court heard testimony that both Hans Arnston, the director of nursing and an RN, and Patti Wittkopp, the physician's assistant, were on call

10

the night that Bailey withdrew Merry's blood. Nancy Hansen, the Health Center's CEO, testified that the Health Center does not have a physician, but does have a physician's assistant who is on call twenty-four hours a day, seven days a week. Hansen further testified that an RN is on call whenever an LPN is on duty, and that Arnston was on call the night that Bailey drew Merry's blood. According to Hansen, an RN is on call in case a situation arises that an LPN is not qualified to handle.

¶24 Hansen also testified that Arnston provides LPNs training in blood drawing. When an LPN demonstrates his or her proficiency at drawing blood, the LPN receives a "competency" in that area and is permitted to draw blood. Hansen testified that Bailey had received the competency to withdraw blood. Hansen further testified that LPNs are supervised by "telephone the same way our medical provider provides supervision to our physician's assistant."

¶25 Bailey testified that she was supervised and directed by superior staff on the night that she drew Merry's blood. Bailey testified that Arnston and Wittkopp are her supervisors and that Arnston was the person she calls when she needs assistance. She stated, "I am under the direction of an RN at all times. If I need them to come in and I can't handle a situation, I do, I call. [There's] always somebody on call for me."

¶26 The District Court determined that Bailey was subject to the supervision and direction of the on-call RN and that the offsite level of supervision and direction satisfied the requirements of § 61-8-405(1), MCA. The supervision in this case falls within the statutory language and is consistent with the purpose of § 61-8-405(1), MCA; thus, we

11

conclude that the District Court did not err when it concluded that the offsite supervision and direction of the on-call RN satisfied the requirements of § 61-8-405(1), MCA, and that the District Court correctly denied Merry's motion to suppress.

¶27 **II     Does the Health Center's policy unlawfully allow LPNs to conduct blood draws without the supervision and direction of a physician or registered nurse?**

¶28     Merry maintains that the Health Center's policy added LPNs to the list of professionals who are authorized to draw blood without the supervision and direction of a physician or RN. Merry contends that such an amendment to § 61-8-405(1), MCA, is unlawful.

¶29     We conclude that Merry's argument is meritless. Montana law, not a health facility's policy, governs the admissibility of a blood sample. To be admissible, a blood sample must have been obtained by a physician, RN, or "other qualified person" acting under a physician's or RN's supervision and direction. Section 61-8-405(1), MCA. As discussed under Issue I, Bailey met the statutory requirements, and the District Court did not err in denying Merry's motion to suppress.

¶30 **III     Do violations of the Health Center's policy demonstrate that Bailey was not an "other qualified person acting under the supervision and direction of a physician or registered nurse" as required by § 61-8-405(1), MCA?**

¶31     Merry contends that Bailey did not comply with the Health Center's policy when she drew Merry's blood sample because she did not obtain a written statement, as

12

required by the policy, from Deputy Speer asserting that Merry was under arrest for DUI or that Deputy Speer had probable cause to believe Merry was DUI and had been in an accident. Merry claims these failures establish that Bailey was not a "qualified person acting under the supervision and direction of a physician or registered nurse" as required by § 61-8-405(1), MCA. We decline to address this issue. As discussed in ¶ 29, Montana law, not a health facility's policy, governs the admissibility of a blood sample. We determined under Issue I that Bailey drew Merry's blood in accordance with § 61-8-405(1), MCA.

¶32   **IV     Did the District Court err when it used Merry's failure to controvert his implied consent to support its ruling?**

¶33   The District Court determined that Bailey met the requirements of § 61-8-405(1), MCA, when she took Merry's blood sample. In the final sentence of the order, the District Court observed, "[a]lso, [Merry] did not controvert that he consented to the blood draw" at the Health Center. Merry contends that the District Court's order suggests that Merry waived the statutory protections of § 61-8-405(1), MCA, based on his implied consent. Merry argues that the court's requirement that he refute his consent as a condition to challenging the admissibility of his blood draw is inconsistent with Montana law and constitutional guarantees. We determined under Issue I that the District Court correctly concluded that Bailey met the statutory requirements of § 61-8-405(1), MCA,

13

and that the District Court correctly denied Merry's motion to suppress. Thus, we need not address the District Court's alternative rationale.

¶34    Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE

Justice James C. Nelson dissents.

¶35    I agree with ¶¶ 13 and 15 of the Court's Opinion. However, given the statute's plain language and its sketchy legislative history (Opinion, ¶¶ 17 and 18), I believe that the Court misreads § 61-8-405(1), MCA. This statute provides:

> Only a physician or registered nurse, or *other qualified person acting under the supervision and direction of a physician or registered nurse*, may, at the request of a peace officer, withdraw blood for the purpose of determining any measured amount or detected presence of alcohol, drugs, or any combination of alcohol and drugs in the person. This limitation does not apply to the sampling of breath. [Emphasis added.]

¶36    From what legislative history there is, I believe that the Legislature amended § 61-8-405(1), MCA, in 1981 to accomplish two things. First, the Legislature acknowledged that there are any number of persons who are qualified by training and

14

experience to *draw* blood. Second, the Legislature, nevertheless, believed that it was still necessary to vest in two particular types of professional healthcare providers—physicians and registered nurses—the power to decide *whether blood should be drawn and, if so, by whom*.

¶37 As noted in ¶ 18, the bill's proponents were desirous of removing challenges to blood tests "not performed" by a physician or registered nurse. The DOJ believed that "qualified persons, such as laboratory technicians" should be "allowed to *take* blood samples" (emphasis added). Likewise, Senator Mazurek was concerned about the limitations on those who could "draw" blood. However, with its main goal to broaden the categories of persons who could *draw* or *take* blood, the Legislature still required that if the blood sample was not physically drawn by the physician or registered nurse, the otherwise "qualified person" drawing the sample had to act under the "supervision and direction" of a physician or registered nurse. Section 61-8-405(1), MCA.

¶38 With that in mind, I believe that, at a minimum, the "acting under the supervision and direction" language of the statute contemplates: (1) that the physician or registered nurse actually determine that the blood draw is medically appropriate in terms of there being a lawful request, from an authorized person, to perform the test on a proper patient[1] (hereafter, I refer to these, collectively, as the medical determinations); and (2) that,

---

[1] I presume that neither this Court nor the Legislature deems a person to be any less entitled to appropriate medical determinations, protocols and treatment when undergoing a blood draw simply because he or she is drunk.

15

having made these medical determinations, the physician or registered nurse then orders the person who he or she deems qualified to actually draw the blood.

¶39 The Court's interpretation of the statutory language marginalizes the role of the physician or registered nurse and the medical determinations that would necessarily be made before ordering a blood draw—for DUI purposes or otherwise. The plain language of the statute requires that the physician or registered nurse be the person in charge—i.e., be acting in a supervisory and directive capacity over the technician. Here, the record is clear that LPN Bailey—qualified to *draw* blood though she may be—was the person in charge. It was she who made the medical determinations referred to above. It was she who was acting as her own supervisor—utilizing her actual supervisors only in the event that "she need[ed] assistance" or when there was a situation she could not "handle." Opinion, ¶ 25.

¶40 That is not what § 61-8-405(1), MCA, requires. Under the framework of the statute, the technical person draws the blood. The physician or registered nurse determines if, how, and from whom the blood sample is to be taken. The Court's interpretation of the statute effectively emasculates the function of the physician and registered nurse. As here, those decision-making professionals are relegated to pinch-hitters if something goes wrong during the draw—people to call if back-up or advice is needed or if the situation devolves into something the technician can't handle. While I agree that the statute does not textually address the on-site/off-site issue, it strikes me that a healthcare provider is simply asking to be sued if a DUI blood draw goes south, and the

16

technician—who made the medical determinations at the outset—is left to frantically try to locate a physician or registered nurse to bail her or him out.

¶41 Curiously, the Court cites *State v. Zakovi*, 2005 MT 91, 326 Mont. 475, 110 P.3d 469, in support of its decision. Rather, *Zakovi* supports the undersigned's interpretation of the statutory language. In that case, the defendant moved to suppress the blood alcohol test on the grounds that the sample was collected in violation of § 61-8-405(1), MCA. Zakovi contended that the technician withdrew his blood sample at the request of the arresting officer and not pursuant to the supervision or direction of a physician or registered nurse. *Zakovi*, ¶¶ 33-34. We observed in that case that the technician testified that she was "continuously under the supervision of a registered nurse on duty in the emergency room, as her position is subordinate and requires compliance with the registered nurse's orders under hospital policy." *Zakovi*, ¶ 36. Accordingly, we concluded that the blood sample was drawn in accordance with the statutory requirements. *Zakovi*, ¶ 36.

¶42 Unlike *Zakovi*, the record here is clear that Bailey was not continuously under the supervision of a registered nurse on duty in the emergency room, nor did Bailey draw Merry's blood sample in compliance with a registered nurse's order. Indeed, Bailey was in charge of the whole blood-draw operation; she acted on no physician's or registered nurse's orders; she was neither supervised nor directed by anyone. Bailey's supervisors were simply "on-call" if she needed help, needed advice, or couldn't handle the situation. *Zakovi* supports the diametrically opposite result than that reached by the Court here.

17

¶43 Under the Court's interpretation of the statute, the technician is the person actually in charge of the entire blood-draw operation. The technician involves the physician or registered nurse only in the event of an apparent emergency. That is not what the "acting under the supervision and direction" language plainly requires or what the Legislature obviously envisioned. From the structure and language of § 61-8-405(1), MCA, the Legislature contemplated that the medical determinations referred to above would be made at a certain professional level—by a physician or registered nurse—as opposed to the technical level at which they were made here, and at which they will be made in future cases based on our Opinion.

¶44 I would hold that Merry's blood sample was collected in violation of § 61-8-405(1), MCA; I would order that blood sample evidence suppressed; and I would reverse and remand for further proceedings

¶45 Accordingly, I dissent.

/S/ JAMES C. NELSON

Chief Justice Karla M. Gray joins in the dissent of Justice James C. Nelson.

/S/ KARLA M. GRAY