FILED

November 19 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 10-0109

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 246

RENEE GRIFFITH,

  Plaintiff and Appellant,

 v.

BUTTE SCHOOL DISTRICT NO. 1,
CHARLES UGGETTI and JOHN METZ,

  Defendants and Appellees.

APPEAL FROM: District Court of the Thirteenth Judicial District,
     In and For the County of Yellowstone, Cause No. DV 09-0539
     Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

  For Appellant:

    William J. O'Connor, II (argued), O'Connor & O'Connor, PC,
    Billings, Montana

  For Appellees:

    Debra A. Silk, Tony C. Koenig (argued), Aaron Navin Bouschor,
    Montana School Boards Association, Helena, Montana

        Argued and Submitted: September 14, 2010

             Decided: November 19, 2010

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    Renee Griffith (Griffith) appeals from an order entered by the Thirteenth Judicial District, Yellowstone County, granting summary judgment in favor of Butte School District No. 1 (School District), Charles Uggetti (Uggetti), and John Metz (Metz). She appeals the District Court's conclusion that her claims were barred by the Montana Human Rights Act and argues the court erred in finding the School District's action did not violate her rights to free speech and to freedom of religion under the United States and Montana Constitutions. We reverse and remand.

## ISSUES

¶2    We consider the following issues:

¶3    1. Did the District Court err in ruling the exclusivity provision of the Montana Human Rights Act barred Griffith's claims for violation of her state and federal constitutional rights to free speech and freedom of religion?

¶4    2. Did the District Court err in concluding that the School District's refusal to permit Griffith to state her personal religious views during her valedictory speech did not violate Griffith's state and federal constitutional rights to free speech and freedom of religion?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5    The parties do not dispute the material facts. During the 2007–2008 academic year, Griffith was a senior at Butte High School (BHS), which is a school in the School District. Metz was the principal of BHS and Uggetti was the superintendent of the

3

School District. Griffith, along with several classmates, achieved the distinction of being named valedictorians of the class of 2008, and was invited to speak at the May 29, 2008 graduation ceremony. Griffith was one of the valedictorians who expressed a desire to deliver a speech.

¶6 Neither the School District nor BHS had written guidelines for student speakers addressing the content of valedictory speeches. The students were told their remarks had to be "appropriate, in good taste and grammar, and should be relevant to the closing of [their] high school years." The style and topic of the speech was left to each speaker. Since there were several valedictorians, Griffith was asked to give her remarks jointly with another student, Ethan Keeler. Together, Griffith and Keeler decided to give a speech in an alternating fashion on the topic of what they learned in high school.

¶7 Among the remarks Griffith wrote and intended to deliver at the graduation ceremony, she included the following passage:

> I learned to persevere these past four years, even through failure or discouragement, when I had to stand for my convictions. I can say that my regrets are few and far between. I didn't let fear keep me from sharing Christ and His joy with those around me. I learned to impart hope, to encourage people to treat each day as a gift. I learned not to be known for my grades or for what I did during school, but for being committed to my faith and morals and being someone who lived with a purpose from God with a passionate love for Him.

Griffith felt she could not accurately convey her high school experience without mentioning these motivations for her accomplishments, actions, and life purpose.

¶8 In the days prior to the graduation ceremony, the student speakers met with Stephen Riordan, a speech coach asked by the school to assist the students with their

speeches. During their second meeting, Riordan relayed a message from Superintendent Uggetti to Griffith—she must omit the references to "God" and "Christ" in her speech because religious references were not permitted in graduation speeches.

¶9     Two days before the graduation ceremony, Griffith and her father met with Uggetti, who gave them a copy of the School District's policies. Uggetti reiterated that religious references would not be allowed in students' graduation speeches. The two policies that relate to graduation ceremonies and speeches, and that are issue in this case, are School District Policies Nos. 2333 and 2332.

¶10    The relevant text of School District Policy No. 2333 is found under the heading *Organization and Content for Commencement Speeches* and states:

> The school administration shall not censor any presentation or require any content, but may advise the participants about appropriate language for the audience and occasion. Students selected to participate may choose to deliver an address, poem, reading, song, musical presentation, prayer, or any other pronouncement of their choosing.

This policy also requires the printed graduation ceremony program to include the following paragraphs (hereinafter the "Disclaimer"):

> *Any presentation by participants of graduation exercises is the private expression of the individual participants and does not necessarily reflect any official position of the District, its Board, administration, or employees, or indicate the views of any other graduates.*
>
> *The Board recognizes that at graduation time and throughout the course of the educational process, there will be instances where religious values, religious practices, and religious persons will have some interaction with the public schools and students. The Board, however, does not endorse religion, but recognizes the rights of individuals to have the freedom to express their individual political, social or religious views, for this is the essence of education.*

5

Under the heading of *Graduation Ceremonies*, the pertinent section of School District Policy No. 2332 says:

> Graduation is an important event for students and their families. In order to assure the appropriateness and dignity of the occasion, the District sponsors and pays for graduation ceremonies and retains ultimate control over their structure and content.
>
> . . .
>
> The District may not prefer the beliefs of some students over the beliefs of others, coerce dissenters or nonbelievers, or communicate any endorsement of religion.

¶11 The School District contends that its practice is to follow Policy No. 2332 and not No. 2333, even though both policies are current and remain in effect. Thus, while the School District prints the Disclaimer set out in Policy No. 2333 in the graduation program, it also requires students to submit their remarks for review prior to the graduation ceremony. Contrary to the written non-censorship language in Policy No. 2332, it is the practice of the School District to prohibit religious references of any kind in student speeches.

¶12 Consequently, one day before the graduation ceremony, Uggetti summoned Griffith to his office and proposed the following changes to her remarks:

> I learned to persevere these past four years, even through failure or discouragement, when I had to stand for my convictions. I can say that my regrets are few and far between. I didn't let fear keep me from sharing **my faith** with those around me. I learned to impart hope, to encourage people to treat each day as a gift. I learned not to be known for my grades or for what I did during school, but for being committed to my faith and morals and being someone who lived with a purpose **derived from my faith and based on a love of mankind.** (Emphasis added.)

6

¶13   Griffith informed Uggetti she would not change her original remarks because she believed she could not speak of what she had learned in high school without acknowledging Christ and God.  Uggetti told Griffith that, while he was ultimately in charge of the School District, he would defer to the judgment of Principal Metz concerning whether or not Griffith would be allowed to speak.  He repeated, however, that it was unlikely she would be allowed to speak unless she removed the religious references.

¶14   At the graduation practice, Metz called Griffith and Keeler aside and told Griffith she had to either remove the religious references from her remarks or not speak at all.  Griffith responded that she would not change her speech.

¶15   In accordance with Policy No. 2333, the Disclaimer was printed in the May 29, 2008 BHS graduation program.  During the graduation ceremony, Keeler gave his valedictory speech with another partner.  Griffith was not permitted to speak because she would not remove the religious references from her speech.

**The Human Rights Bureau Administrative Proceedings**

¶16   On July 23, 2008, Griffith filed a timely complaint with the Montana Human Rights Bureau (HRB).  She alleged Uggetti, Metz, and the School District had discriminated against her in her education on the basis of creed or religion in violation of the Montana Human Rights Act (MHRA), specifically § 49-2-307, MCA.  Pursuant to § 49-2-504(1), MCA, an HRB investigator conducted an informal investigation of Griffith's allegations of discrimination in education based on her religion.  The

investigator took statements from all of the parties, reviewed pertinent documents, and interviewed witnesses.

¶17     The investigator filed a Final Investigative Report with the HRB recommending a finding of "no cause to believe unlawful discrimination occurred as set forth in Griffith's complaint." On January 20, 2009, Griffith received a two-page letter from the HRB entitled "Notice of Dismissal and Notice of Right to File Civil Action in District Court."

**The District Court Proceedings**

¶18     Upon receipt of the notice of dismissal from the HRB and pursuant to § 49-2-511, MCA, Griffith filed a timely complaint in the Thirteenth Judicial District, Yellowstone County. Griffith claimed the School District, Uggetti, and Metz violated her state and federal constitutional rights to free speech and freedom of religion. Her complaint alleged, in six counts, that the defendants violated: (I) the MHRA, Title 49, chapter 2, MCA; (II) the Governmental Code of Fair Practices, Title 49, chapter 3, MCA;[1] (III) Article II, Section 5 of the Montana Constitution; (IV) Article II, Section 7 of the Montana Constitution; (V) the First Amendment to the United States Constitution; and (VI) the Fourteenth Amendment to the United States Constitution. Griffith's complaint prayed for nominal and compensatory damages, as well as attorney fees.

¶19     On cross-motions for summary judgment, the District Court found in favor of the School District. The court determined the exclusivity provision of the MHRA barred Counts III through VI because, while Griffith pled these claims as constitutional tort

---

[1] Griffith did not appeal the District Court's ruling on this issue, and we therefore decline to address it in this Opinion.

8

actions, the gravamen of the claims was discrimination. As to Count I, violation of the MHRA, the District Court found the School District did not violate the First Amendment to the United States Constitution or § 49-2-307(1), MCA, when it prohibited Griffith from delivering her unedited remarks. The court concluded that the School District's practice of excluding expression of personal religious views in student speeches was a reasonable basis for its action against Griffith. Furthermore, since the practice was applied evenly, and with the intent to preclude any implied endorsement of religious views by the School District, the court held the School District's decision prohibiting Griffith from speaking did not violate either the Establishment Clause of the First Amendment to the United States Constitution or § 49-2-307(1), MCA.

¶20 Griffith appeals the District Court's order granting summary judgment in favor of the School District, Uggetti, and Metz.

## STANDARD OF REVIEW

¶21 We review orders of summary judgment de novo, applying the same criteria employed by the district court pursuant to M. R. Civ. P. 56. *PPL Montana, LLC v. State*, 2010 MT 64, ¶ 84, 355 Mont. 402, 229 P.3d 421. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c). When the material facts are undisputed, we review a district court's conclusions of law for correctness. *Edwards v. Cascade Co. Sheriff's Dept.*, 2009 MT 451, ¶ 38, 354 Mont. 307, 223 P.3d 893.

9

**DISCUSSION**

¶22 The School District first argues Griffith's claims are moot because Griffith has graduated from BHS and has not sought monetary damages. Griffith asserts that she seeks to vindicate her constitutional rights and her original claim for nominal damages in her complaint prevents the action from becoming moot.

¶23 "Mootness is a threshold issue which we must resolve before addressing the substantive merits of a dispute." *In the Matter of the Mental Health of D.V.*, 2007 MT 351, ¶ 30, 340 Mont. 319, 174 P.3d 503 (quoting *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 31, 333 Mont. 331, 142 P.3d 864). A matter is moot when, due to the occurrence of an event or passage of time, the issue ceases to present a justiciable controversy or the court cannot grant effective relief. *Id*.

¶24 Griffith's prayer in her complaint for nominal damages for violation of her constitutional rights prevents this action from becoming moot. *Jacobs v. Clark Co. Sch. Dist.*, 526 F.3d 419, 425-26 (9th Cir. 2008) (citing *Bernhardt v. Co. of Los Angeles*, 272 F.3d 862, 872 (9th Cir. 2002)). Plaintiffs who prove a violation of their constitutional rights must be awarded nominal damages as a matter of law. *Cummings v. Connell*, 402 F.3d 936, 944 (9th Cir. 2005) (citing *Schneider v. Co. of San Diego*, 285 F.3d 784, 794-95 (9th Cir. 2002)); *see also Carey v. Piphus*, 435 U.S. 247, 266, 98 S. Ct. 1042, 1053-54 (1978). As Griffith's complaint clearly prays for nominal damages; her claim is

not moot. As a result, we address the merits of the substantive issues presented on appeal.[2]

**¶25 Issue One. Did the District Court err in ruling the exclusivity provision of the Montana Human Rights Act barred Griffith's claims for violation of her state and federal constitutional rights to free speech and freedom of religion?**

¶26 "We determine the substantive rights between the parties according to the law in effect at the date of injury." *Boettcher v. Mont. Guaranty Fund,* 2007 MT 69, ¶ 14, 336 Mont. 393, 154 P.3d 629 (quoting *Anderson v. Werner Enterprises, Inc.,* 1998 MT 333, ¶ 28, 292 Mont. 284, 972 P.2d 806). Griffith's injury occurred in May 2008. The law in effect at the time of Griffith's injury was the 2007 version of the MHRA. In reaching its decision, the District Court purported to apply the 2009 version of the MHRA, which is in all pertinent respects the same as the 2007 version. However, the court then went on to erroneously analyze this case under the rationale of *Saucier v. McDonald's Restaurants of Montana, Inc.,* 2008 MT 63, 342 Mont. 29, 179 P.3d 481. Our reasoning in *Saucier* was wholly premised on the 2001 version of the MHRA that was in effect at the time of Saucier's claimed injury. As we noted in Footnote 1 of *Saucier,* "[b]ecause many portions of the MHRA have been revised since its enactment . . . all statutory references in this Opinion are to the 2001 version of the MHRA, which was in effect during the time period relevant to this case." *Saucier,* ¶ 37. Given the significant revisions to the MHRA in 2007, which change and simplify the exclusivity provision of the MHRA that was at issue in *Saucier,* much of the analysis in *Saucier* has no application here.

---

[2] The parties also addressed the exception to the mootness doctrine that exists when the issue is capable of repetition yet may evade review. Because we find the prayer for damages precludes a finding of mootness, it is unnecessary to reach this question.

11

¶27 This is the first opportunity this Court has had to interpret the MHRA's procedural and exclusivity provisions, as amended in 2007. Since neither the parties nor the District Court acknowledged or addressed the Montana Legislature's 2007 amendments, we review the salient MHRA provisions and note the significant changes made by the Legislature. We then apply the correct law to the facts of this case.

## A. The 2007 amendments to the MHRA

¶28 In 2007, the Montana Legislature enacted House Bill 76 (HB 76) to amend the MHRA and specifically address the confusion courts and attorneys expressed regarding when and how a complaint alleging discrimination could be brought to district courts in light of the exclusive remedy provision of the MHRA. *See* Mont. H. Bus. & Lab. Comm., *Minutes on the Hearing on HB 76*, 60th Leg., Reg. Sess. 3 (Jan. 12, 2007). During both the House and Senate hearings, the sponsor of HB 76, Rep. Walter McNutt, clearly expressed that the intent of the 2007 amendments was to clarify the procedures. *Id.* Germane to this case are the amendments clarifying how a case that is initially brought to the HRB can, ultimately, proceed to the district court for a trial on the merits. Sections 49-2-504, -511 and -512, MCA (2007), contain the significant procedures.

¶29 **Section 49-2-504(7)(b), MCA.** The 2007 Legislature added new subsection (7)(b) to the then-existing § 49-2-504, MCA:

> (7)(b) If the department finds that there is no reasonable cause to believe that unlawful discrimination occurred, it shall issue a notice of dismissal and dismiss the case from the department's administrative process. After receipt of a notice of dismissal, a charging party may:
> (i) continue the administrative process by filing objections with the commission as provide in 49-2-511; or

12

(ii) **discontinue the administrative process and commence proceedings in district court as provided in 49-2-511.** (Emphasis added.)

¶30    **Section 49-2-509, MCA.**  This section was repealed in 2007.  Prior to 2007, subsection (7) contained the exclusivity provision that we interpreted in *Saucier,* ¶¶ 43-44*, Vettel-Becker v. Deaconess Med. Ctr. of Billings, Inc.*, 2008 MT 51, ¶¶ 31–34, 341 Mont. 435, 177 P.3d 1034*,* and *Edwards*, ¶¶ 69–75.

¶31    **Section 49-2-511, MCA.**  This section was added as a new section in 2007. Relevant to this case is subsection (3)(a), which states:

> **Dismissal after informal proceedings – filing of objections – procedures – action in district court.**
>
> .  .  .
>
> (3)(a) Within 90 days after the department has issued a notice of dismissal pursuant to 49-2-501(5) or 49-2-504(7)(b) or within 90 days after the commission has issued an order affirming the department's notice of dismissal pursuant to subsection (2)(b) of this section, the charging party **may commence a civil action for appropriate relief on the merits of the case** in the district court in the district in which the alleged violation occurred.  If the charging party fails to commence the civil action in the district court within 90 days after the final agency decision has been issued, the claim is barred.  **The court may provide the same relief as described in 49-2-506.**  In addition, the court may in its discretion allow the prevailing party reasonable attorney fees and costs.  (Emphasis added.)

¶32    **Section 49-2-512, MCA.**  This section became a stand-alone section in 2007. While subsection (1) contains the same exclusivity provision previously codified as § 49-2-509(7), MCA, subsections (2) and (3) were added:

> **Filing in district court – compliance with administrative procedures required.**  (1) The provisions of this chapter establish the exclusive remedy for acts constituting an alleged violation of chapter 3 or this chapter, including acts that may otherwise also constitute a violation of the discrimination provisions of Article II, section 4, of the Montana

13

constitution or 49-1-102.  A claim or request based upon the acts may not be entertained by a district court other than by the procedures specified in this chapter.

(2) In addition to dismissal under 49-2-501(5) or 49-2-504(7)(b), the department shall dismiss a complaint if:

(a) the charging party fails to keep the department advised of changes of address and the department finds that the failure has impeded the administrative proceedings; or

(b) a period of 12 months has elapsed from the filing of a complaint and neither the department nor the commission has held a hearing pursuant to 49-2-505 or an informal hearing pursuant to 49-2-511.  However, the department or the commission may refuse to dismiss a complaint under this subsection (2)(b) if:

(i) more than 30 days have elapsed since service of notice of hearing under 49-2-505;

(ii) the parties have stipulated to a reasonable extension of the timeframes; or

(iii) through litigation a party has unsuccessfully sought to prevent the department or the commission from conducting administrative proceedings on the complaint.

(3) Within 90 days after the department has issued a notice of dismissal pursuant to subsection (2), the charging party **may commence a civil action for appropriate relief on the merits of the case** in the district court in the district in which the alleged violation occurred.  If the charging party fails to commence the civil action in the district court within 90 days after the dismissal has been issued, the claim is barred.  **The court may provide the same relief as described in 49-2-506.**  In addition, the court may in its discretion allow the prevailing party reasonable attorney fees and costs.  (Emphasis added.)

**B.  Statutory interpretation of the 2007 MHRA.**

¶33    The rules of statutory construction are well-settled. Section 1-2-101, MCA, commands that:

In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not insert what has been omitted or to omit what has been inserted.  Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.

14

Additionally, "the intention of the legislature is to be pursued if possible," § 1-2-102, MCA, and no further interpretation is required when the plain language of the statute is clear and unambiguous. *Miller v. Eighteenth Jud. Dist. Ct.*, 2007 MT 149, ¶ 38, 337 Mont. 488, 162 P.3d 121 (citations omitted).

¶34    The plain language of §§ 49-5-504, -511, and -512, MCA (2007), is clear and unambiguous.[3]    Section 49-2-504(7)(b)(ii), MCA, clearly states that once the HRB dismisses a complaint, the charging party may file a complaint in district court, so long as the party complies with § 49-2-511, MCA, and files the complaint within ninety days of the HRB's notice of dismissal.  Additionally, § 49-2-511(3)(a), MCA, clarifies that, at this point, the district court must hold a trial on the merits of the case and may provide the relief outlined in § 49-2-506, MCA, in addition to awarding attorney fees and costs. This plain reading of the statues is harmonious with the 2007 Legislature's intent to clarify the procedural pathway a discrimination case takes through the HRB process.

¶35    Given the 2007 substantive revisions to the MHRA, the gravamen analysis upon which we relied commencing with *Harrison v. Chance*, 244 Mont. 215, 797 P.2d 200 (1990), and through our decisions in *Saucier, Vettel-Becker,* and *Edwards* is, mercifully, no longer necessary when analyzing the propriety of filing suit in district court following notice of dismissal by the HRB.  We caution their holdings may still be viable, however, in those situations where the plaintiff files a claim "sounding in discrimination" in the district court without first filing a claim before the HRB and receiving a notice of

---

[3] Unless indicated otherwise, all subsequent statutory references in this Opinion are to the 2007 version of the MHRA, which was in effect during the time period relevant to this case.  Of note, there was no change in the MHRA between the 2007 and 2009 versions.

15

dismissal. *See Vettel-Becker*, ¶ 37; *Edwards*, ¶ 75. If a claim "sounding in discrimination" is brought to the district court absent an accompanying notice of dismissal from the HRB, it could be barred by § 49-2-512(1), MCA (2007).

**C. Griffith's claims are not barred by the MHRA exclusivity provision**

¶36 The statutory language of §§ 49-2-504, -511 and -512, MCA, is unambiguous. The statutes permit a party to take a case to district court for a trial on the merits once the action is dismissed from the HRB. There is no provision that allows a district court to essentially remand a case back to the HRB if it disagrees with the HRB and finds the complaint sounds in discrimination. In this situation, §§ 49-2-511(3)(a) and -512(3), MCA, specifically state the district court may provide the same relief to the prevailing party as would have been received in the administrative process.

¶37 Accordingly, Griffith was entitled to a trial in district court addressing the merits of all of her claims, including her discrimination allegations. Griffith complied with § 49-2-501, MCA, and filed a timely complaint with the HRB. Upon concluding its investigation, the HRB issued a notice of dismissal and right to sue in district court, in compliance with the plain language of § 49-2-504(7)(b), MCA.

¶38 In the notice of dismissal, the HRB outlined Griffith's options for appealing its decision, including her right to a trial on the merits in district court. The notice accurately reflected and conveyed the plain language of the MHRA. It stated that, pursuant to § 49-2-504(7), MCA, "the HRB shall dismiss a complaint and the charging party may file a civil action in the district court" if the HRB finds the complaint was unsupported by a preponderance of the evidence. The notice went on to state, in all

16

capital letters, that Griffith had ninety days from the date of the notice of dismissal to file a complaint in district court. The notice ended by reiterating: (1) the case was dismissed from the administrative procedure; (2) the charging party may file an action in district court; and (3) the district court may award attorney fees to the prevailing party.

¶39 We conclude that, on its face, the notice of dismissal comports with the plain meaning of the current MHRA. We defer to the HRB's interpretation because it is reasonable and in accordance with the spirit and the legislative intent of the amended statutes. *Clark Fork Coalition v. Mont. Dept. of Envtl. Quality*, 2008 MT 407, ¶ 20, 347 Mont. 197, 197 P.3d 482. Therefore, we reverse the District Court and hold that Griffith's claims were not barred by the exclusivity provision of the MHRA.

¶40 **Issue Two. Did the District Court err in concluding that the School District's refusal to permit Griffith to state her personal religious views during her valedictory speech did not violate Griffith's state and federal constitutional rights to free speech and freedom of religion?**

¶41 Before turning to the substantive merits of Griffith's appeal, we address two preliminary issues. First, for the reasons set forth below, Griffith's claims were properly pled as constitutional tort actions. We agree with the HRB that her claims did not allege discrimination within the meaning of the MHRA.

¶42 Second, the parties present several undeveloped arguments that we decline to consider. Parties must present a reasoned argument to advance their positions, supported by citations to appropriate authority. M. R. App. P. 12(f). When a party fails to do so, our caselaw is well-settled. We will not consider unsupported issues or arguments. *In re Marriage of McMahon,* 2002 MT 198, ¶ 6, 311 Mont. 175, 53 P.3d 1266. Moreover,

"[i]t is not this Court's job to conduct legal research on [a party's] behalf, to guess as to [a party's] precise position, or to develop legal analysis that may lend support to that position." *Johansen v. Dept. of Nat. Resources & Conservation*, 1998 MT 51, ¶ 24, 288 Mont. 39, 955 P.2d 653 (citations omitted); *see also State v. Gomez*, 2007 MT 111, ¶ 33, 337 Mont. 219, 158 P.3d 442.

¶43 Griffith presents a two–paragraph, undeveloped argument that the School District violated her right to free speech under Article II, Section 7 of the Montana Constitution. The School District does not address Article II, Section 7 of the Montana Constitution at all, except to assert it did not violate Griffith's right to free speech under the provision. We will not formulate arguments for the parties; we therefore decline to consider this issue further.

¶44 Next, Griffith presents an undeveloped argument that the School District violated her constitutional right to equal protection of the law under the Fourteenth Amendment of the United States Constitution because the School District prohibited her from delivering her unedited valedictory speech. She does not identify what group or classification is at issue, or whether she claims to be a "class of one," which is the preliminary step of an equal protection analysis. The School District merely reiterates portions of its First Amendment arguments without squarely addressing the equal protection claim. Neither party presents a fully-developed legal analysis as to the equal protection claim. Therefore, we also decline to consider this issue further.

18

¶45    With those preliminary matters addressed, for the reasons discussed herein, we hold: (1) the School District violated Griffith's right to freedom of speech under the First Amendment of the United States Constitution, entitling her to relief under 42 U.S.C. § 1983 (2006); and (2) the School District did not violate Griffith's right to freedom of religion under either Article II, Section 5 of the Montana Constitution or the First Amendment of the United States Constitution.

**A. The School District violated Griffith's constitutional right to freedom of speech when it imposed a non-neutral, viewpoint-based limitation on the content of her valedictory speech**

¶46    "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Denke v. Shoemaker*, 2008 MT 418, ¶ 47, 347 Mont. 322, 198 P.3d 284 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995)). Viewpoint discrimination is "an egregious form of content discrimination," and "the government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. (quoting *Rosenberger*, 515 U.S. at 829, 115 S. Ct. at 2516). These basic principles of constitutional law forbid the government from practicing viewpoint discrimination in any forum—public, limited public, or non-public. *Rosenberger*, 515 U.S. at 829-30, 115 S. Ct. at 2516-17.

¶47    Students' free speech rights in a school setting have not historically turned on the type of forum created by a graduation ceremony, or the degree of regulatory control

school officials have in each of those various forums. As discussed more fully below, the extent of a student's right to free speech is determined on a case-by-case basis, in light of the special circumstances of a school environment. *Infra* ¶ 49. Because questions regarding forum (public, limited public, or non-public) have not formed part of the analysis in free speech cases arising in the school environment, the parties' arguments asserting general First Amendment forum concerns are inapposite.

¶48 The United States Supreme Court's present approach to a student's right to free speech was first articulated in *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733 (1969). Since then, however, the United States Supreme Court has often "set the [*Tinker*] standard aside on an ad hoc basis." *Morse v. Frederick*, 551 U.S. 393, 417-18, 127 S. Ct. 2618, 2634 (2007) (Thomas, J. concurring). Therefore, we must extrapolate the pertinent rules from the relevant federal cases.

¶49 Students "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but their rights are not commensurate with the rights of adults and "must be applied in light of the special circumstances of the school environment." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S. Ct. 562, 567 (1988) (quoting *Tinker*, 393 U.S. at 506, 89 S. Ct. at 736). School officials may not impose viewpoint-based limitations on student speech in the school setting unless (1) school officials reasonably conclude the speech will "materially and substantially disrupt the work and discipline of the school," *Tinker*, 393 U.S. at 513, 89 S. Ct at 740; (2) the student's expression in a school-sponsored activity may reasonably be "perceive[d] to

bear the imprimatur of the school," *Hazelwood*, 484 U.S. at 271, 108 S. Ct. at 570; or (3) the expression can be "reasonably viewed as promoting illegal drug use." *Morse*, 551 U.S. at 409, 127 S. Ct. at 2629.

¶50 Applying this analytical framework to Griffith's case, we conclude the School District violated Griffith's constitutional right to free speech because this matter does not fall within any of the three recognized situations in which it is permissible for school officials to impose a viewpoint-based limitation on student speech. First, the *Morse* exception is clearly inapplicable because Griffith's religious references in her valedictory speech are wholly unrelated to illegal drug use. Second, it would be unreasonable to conclude that Griffith's brief mention of her personal religious views would materially and substantially disrupt the graduation ceremony, and indeed the School District never argues as such. Finally, we address the only exception argued by the parties—whether Griffith's passing references to God and Christ could "be perceived to bear the imprimatur of the school."

¶51 We find it unreasonable for the School District to conclude that Griffith's cursory references to her personal religious beliefs could be viewed by those in attendance at the BHS graduation ceremony as a religious endorsement by the School District. To that end, we find both the District Court's and the School District's reliance on *Cole v. Oroville Union High School District*, 228 F.3d 1092 (9th Cir. 2000) misplaced. The District Court and the School District cite *Cole* for the proposition that because the School District retained control over the graduation ceremony, it was permissible for

21

Uggetti and Metz to censor Griffith's speech to prevent, presumably, the School District running afoul of the Establishment Clause. We disagree.

¶52 As the School District correctly recognizes in its brief, *Cole* is factually distinct from this case. Cole, a senior at Oroville High School, attempted to deliver a sectarian, proselytizing invocation, and Niemeyer, another senior, attempted to deliver a valedictory speech that could easily be characterized as a sermon. *Cole*, 228 F.3d at 1097. Niemeyer's speech "advised the audience that 'we are all God's children, through Jesus Christ [sic] death, when we accept his free love and saving grace in our lives,' " requested the audience accept that God created man, and called upon the audience to "yield to God our lives." *Id*. The Establishment Clause of the First Amendment to the United States Constitution "guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.' " *Lee v. Weisman*, 505 U.S. 577, 587, 112 S. Ct. 2649, 2655 (1992) (citations omitted); *see Cole*, 228 F.3d at 1104.

¶53 The Ninth Circuit Court of Appeals concluded that the school district's refusal to permit Cole and Niemeyer to give their respective speeches was reasonable because both the invocation and the valedictory speech were sectarian and proselytizing, which is a type of speech that is, "by definition, designed to reflect, and even convert others, to a particular religious viewpoint." *Cole*, 228 F.3d at 1103 (quoting *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 817-18 (5th Cir. 1999)). The court further stated that, since

22

Niemeyer was undeniably calling on the audience to join him in his beliefs, a reasonable dissenter or nonbeliever could believe that the school district was compelling implicit participation in the proselytizing, which amounts to unconstitutional governmental sponsorship of religion and a clear Establishment Clause violation. *Id.* at 1104 ("The critical inquiry under *Santa Fe* and *Lee* to determine if religious activity at a major public school event constitutes impermissible coercion to participate is whether 'a reasonable dissenter . . . could believe that the group exercise signified her own participation or approval of it.' " (citation omitted)).

¶54    If Niemeyer's remarks represent one end of the spectrum, Griffith's remarks fall on the other end, as the School District once again recognizes in its brief. In a two–page speech, given jointly with another student and premised on a theme of what they learned in high school, Griffith references God or Christ three times. Moreover, each of those references is prefaced by "I learned," or "my faith," and each is unmistakably directed to her personal life and beliefs. Not once did Griffith use the term "we" or "you"; her passing references to her personal beliefs cannot be construed as proselytizing; and her remarks were not part of a group exercise and did not elicit audience participation.

¶55    Furthermore, contrary to *Cole*, no objectively reasonable observer could perceive that Griffith's religious references bore the imprimatur of the School District. In fact, the School District explicitly dissociated itself from Griffith's speech by printing the unambiguous Disclaimer in each graduation program pursuant to Policy No. 2333 stating "any presentation by participants . . . is the private expression of the individual

participants and does not necessarily reflect any official position of the District, its Board, administration, or employees, or indicate the views of any other graduates." More to the point, the second paragraph of the printed Disclaimer avows that any religious expression by students is not endorsed by the School District and then goes on to clarify that individuals "have the freedom to express their individual political, social or religious views, for this is the essence of education." Under these circumstances, there is no real likelihood Griffith's passing religious references in her valedictory speech would have been construed by any in attendance as an endorsement of religious views by the School District.

¶56 Finally, the School District violated its own written policies of non-censorship when it prohibited Griffith from giving her chosen remarks. Policy No. 2333, which explicitly addresses content for graduation speeches, states "the school administration shall not censor any presentation or require any content" and that students who are selected to speak may choose to deliver "an address, poem, reading, song, musical presentation, prayer or any other pronouncement of their choosing." The School District ignored this policy by requiring Griffith to remove the words "God" and "Christ" from her speech.

¶57 For the aforementioned reasons, we reach a narrow holding based on the particular facts of this case. We hold that the School District violated Griffith's right to freedom of speech under the First Amendment of the United States Constitution when it

impermissibly censored the content of her valedictory speech based on the viewpoint she expressed.

**B. Griffith is entitled to relief under 42 U.S.C. § 1983 because the School District, a governmental entity, violated her constitutional right to free speech**

¶58 Since we find that School District deprived Griffith of a federal constitutional right, she is entitled to seek relief under 42 U.S.C. § 1983 (§ 1983). "Section 1983 'is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.' " *Jones v. Mont. Univ. Sys.* 2007 MT 82, ¶ 32, 337 Mont. 1, 155 P.3d 1247 (quoting *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 811 (1994)). To evaluate a § 1983 claim, the first step is to identify the specific federal constitutional violation, and the second step is to determine whether the officials who violated a plaintiff's constitutional rights were acting under the color of state law. *Brown v. McDonald*, 2007 MT 197, ¶ 12, 338 Mont. 390, 165 P.3d 1125 (citations omitted).

¶59 Griffith satisfies the first part of the § 1983 analysis because her federal constitutional right to free speech, as guaranteed by the First Amendment, was violated when she was prohibited from delivering her valedictory speech. *Supra* ¶ 57. We conclude that the second part of the analysis is satisfied as well. The School District is a government entity. Sections 2-9-101(3) and (5), MCA. During the 2007–2008 academic year, Uggetti and Metz, as employees of the School District, were acting in their official capacities as School District superintendent and BHS principal, respectively. Section 2-9-101(2)(a), MCA. The constitutional violation occurred when Uggetti and Metz

precluded Griffith from delivering her chosen remarks at the graduation ceremony. It is undisputed that this was done during the course and scope of their employment as school officials. Because the School District, through the actions of Uggetti and Metz, violated her First Amendment right to free speech, Griffith is entitled to relief under her § 1983 claim.

¶60 The District Court did not reach the question of whether Uggetti and Metz as individually-named defendants, are individually liable for their actions against Griffith. We conclude they are not and they should be dismissed from the action. Section 2-9-305(5), MCA, serves as a complete bar to holding Uggetti and Metz individually liable because it provides immunity from suit to individually-named defendants for actions performed within the course and scope of the official's employment. *See Kiely Constr., LLC v. City of Red Lodge*, 2002 MT 241, ¶¶ 88-89, 312 Mont. 52, 57 P.3d 836; *see also Germann v. Stephens*, 2006 MT 130, ¶ 55, 332 Mont. 303, 137 P.3d 545 (in a § 1983 claim, granting immunity to government officials does not deprive plaintiffs of a remedy against the government entity). All of Griffith's allegations turn on actions performed by Uggetti and Metz, as school officials, in the course and scope of their employment. On remand, we instruct the District Court to dismiss Uggetti and Metz as individual defendants pursuant to § 2-9-305(5), MCA.

**C. The School District did not violate Griffith's state and federal constitutional right to freedom of religion because it neither compelled Griffith to violate the tenets of her religion nor denied her an important governmental benefit**

26

¶61    Griffith argues that the School District infringed on her right to free exercise of religion in violation of Article II, Section 5 of the Montana Constitution and the First Amendment of the United States Constitution.  She claims the School District unduly burdened her religious practice when it prohibited her from saying "God" and "Christ" in her valedictory speech.  The School District argues that Griffith has not demonstrated that her religious beliefs mandate she include personal religious expression in her valedictory speech, nor has she shown that her religious beliefs proscribe delivery of a valedictory speech free of personal religious expression.  On this issue, we agree with the School District.

¶62    "A facially neutral regulation impermissibly infringes on the constitutional requirement of government neutrality if it unduly burdens the free exercise of religion." *Valley Christian Sch. v. Montana High Sch. Assoc.*, 2004 MT 41, ¶ 7, 320 Mont. 81, 86 P.3d 554 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S. Ct. 1526, 1536 (1972)).  To determine whether there is a burden on the free exercise of religion, this Court adopted the *Thomas* test established by the United States Supreme Court:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.

*Id.* (quoting *Thomas v. Review Bd. of Indiana Empl. Sec. Div.*, 450 U.S. 707, 717-18, 101 S. Ct. 1425, 1432 (1981)).

¶63    The first part of the analysis under the *Thomas* test is to determine whether being permitted to deliver a valedictory speech at a high school graduation ceremony is an

27

important benefit. A benefit is an "advantage or privilege." *Black's Law Dictionary* 166 (Bryan A. Garner ed., 8th ed., West 2004). We have previously recognized student participation in extracurricular activities as an important benefit. *Valley Christian School*, ¶ 8 (citing *State ex. Rel. Bartmess v. Bd. of Trustees* [sic], 223 Mont. 269, 275, 726 P.2d 801, 804 (1986)). A student's invitation to deliver a valedictory speech is an honor conferred on the student based on the student's academic success throughout high school. An academic award is a privilege and is certainly analogous to the privilege of participating in extracurricular activities. It follows that delivering a valedictory speech is an important benefit.

¶64 The second part of the *Thomas* analysis focuses on whether Griffith's conduct— expressing her personal religious views in her valedictory speech—was "proscribed by a religious faith" or "mandated by a religious belief." *Valley Christian School*, ¶ 7. Nothing before this Court indicates either that Griffith's religious faith mandates she include personal religious expressions in a speech or that her faith proscribes delivering a speech devoid of personal religious expression. Griffith's personal belief that she could not speak without mention of God and Christ during her speech is not equivalent to a mandate by her religious faith that she do so.

¶65 Therefore, Griffith cannot meet the second prong on the *Thomas* test because she cannot demonstrate that the School District's request that she omit "God" and "Christ" from her speech is incompatible with the tenets of her religious faith. Griffith has not shown that the School District unduly burdened her free exercise of religion when it conditioned the delivery of her valedictory speech on omitting "God" and "Christ" from

the text.  We hold the School District did not violate Griffith's constitutional right to freedom of religion.

## D. Griffith may be entitled to an award of attorney fees because she is the prevailing party under her 42 U.S.C. § 1983 claim

¶66    A prevailing party in a § 1983 claim may be awarded reasonable attorney fees as part of the costs pursuant to 42 U.S.C. § 1988(b).  *Germann*, ¶ 37.  While the power of a court to award attorney fees under 42 U.S.C. § 1988(b) is discretionary, "a prevailing plaintiff in a § 1983 claim should ordinarily recover an attorney's fee 'unless special circumstances would render such an award unjust.' "  *Kiely*, ¶ 50 (citation omitted).  A party is considered to "prevail when actual relief on the merits of [the plaintiff's] claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff."  *Farrar v. Hobby*, 506 U.S. 103, 111-12, 113 S. Ct. 566, 573 (1992).  "A plaintiff who wins nominal damages is a prevailing party under § 1988" because an award of damages, in any amount, changes the legal relationship in favor of the plaintiff "by forcing the defendant to pay an amount of money [the defendant] otherwise would not pay."  *Id*. at 112-13, 113 S. Ct. at 573-74.

¶67    Pursuant to the foregoing statutory law and caselaw, Griffith may be entitled to an award of attorney fees since we conclude she is the prevailing party.  *Supra* ¶ 57.  We instruct the District Court to determine whether to award attorney fees under the law, and if so, to conduct a hearing on the amount.

## CONCLUSION

29

¶68     In sum, we hold Griffith's constitutional claims were not barred by the exclusivity provisions of the MHRA and that the School District violated Griffith's First Amendment right to free speech.  Furthermore, we reverse and remand for entry of summary judgment in Griffith's favor, consistent with this Opinion.  We remand for a determination (1) of the amount of damages to which Griffith is entitled under 42 U.S.C. § 1983; and (2) of whether Griffith is entitled to attorney fees, and, if so, for a hearing and determination of the amount.

¶69     We reverse and remand consistent with this Opinion.


                                                        /S/ PATRICIA COTTER



We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JIM RICE




Justice W. William Leaphart, dissenting.

¶70 I dissent from the Court's resolution of issue 2(a). Having done so, I would not reach issues 2(b) and 2(c).

¶71 First of all, I note that the Court spends considerable time discussing the School District's written policies; how the policies are internally inconsistent and how the District's suggested edits violated Policy No. 3222. If the Court were reversing due to the District's violation of school policy, then the policies and the District's suggested edits would be relevant. However, the Court's self-described "narrow holding" is not that the school violated the policies, but that it violated the First Amendment Right of Free Speech. Thus the sole focus of the analysis should be: what was the content of Griffith's proposed speech, and did the District violate her right of free speech in not allowing her to deliver the speech as proposed?

¶72 Renee Griffith's proposed valedictory speech contained two references to God and one reference to Christ. She proposed to say that "I can say that my regrets are few and far between. I didn't let fear keep me from *sharing Christ and His Joy with those around me*." (Emphasis added.) The Court holds that this was not proselytizing, and that not allowing Griffith to speak was viewpoint discrimination of protected free speech. I disagree.

¶73 Initially, I question whether proselytizing is an accurate litmus test of *Establishment Clause* violations. Although the Ninth Circuit repeatedly referred to impermissible speech in *Cole v. Oroville Union High Sch.*, 228 F.3d 1092, 1104 (9th Cir. 2000), as proselytizing, the decisions in *Lee v. Weisman*, 505 U.S. 577, 587-90, 112 S. Ct. 2649, 2655-57 (1992), and *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 305-310,

31

120 S. Ct. 2266, 2276-79 (2002) make clear that the religious involvement need not be proselytizing or even sectarian in order to be considered impermissible under the *Establishment Clause*. The invocation in *Lee* was decidedly non-sectarian, as was the prayer in *Santa Fe*, yet both were found to violate the *Establishment Clause*. As a legal matter, proselytizing speech will almost certainly trigger *Establishment Clause* concerns. This does not mean, however, that speech *must* be proselytizing to be found constitutionally impermissible. Sectarian religious references short of proselytizing may suffice. Nonetheless, assuming arguendo that proselytizing is the proper test, Griffith's proposed speech tests positive.

¶74    In seeking to "[share] Christ and His Joy with those around" her, Griffith was seeking to induce others to join her religious faith. That is, she was proselytizing. Proselytizing speech is speech that "[is], by definition . . . designed to reflect, and even convert others to, a particular religious viewpoint . . . ." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 817 (5th Cir. 1999). To proselytize is "[t]o induce someone to convert to one's own religious faith." *American Heritage Dictionary* 1454 (3rd ed., Houghton 1992). Even if Griffith's speech is not perceived as proselytizing, it illustrates the impossibility of having school administrators make such arbitrary determinations in the face of the *Establishment Clause*.

¶75    The critical inquiry under *Santa Fe* and *Lee* to determine if religious activity at a major public school event constitutes impermissible coercion to participate is whether "a reasonable dissenter . . . could believe that the group exercise signified her own participation or approval of it." *Lee*, 505 U.S. at 593, 112 S. Ct. at 2658. The court here

reasons that Griffith's three references to God or Christ were not proselytizing because she prefaced each reference with "I learned" or "my faith;" that she did not once use the term "we" or "you." This analysis overlooks that Griffith expressly sought to "share Christ and His Joy with those around her." "Sharing" is not a solitary endeavor. Rather, sharing is to enjoy or experience jointly with another or others. *American Heritage Dictionary* at 1659. "Those around her" were the hundreds of people in the captive audience. They were the "we" and the "you" the Court overlooks.

¶76    In the present case, the purpose to be served by this gathering was to conduct a graduation ceremony, not to share a sectarian religious experience. The District had a legitimate interest in complying with the *Establishment Clause* by not lending its imprimatur to expressions of religious belief at the ceremony. Contrary to this Court's conclusion, it was not Griffith's religious viewpoint the District sought to exclude, but any sectarian religious content in general.

¶77    Griffith cites a number of cases in support of her free speech claim. These cases, however, are clearly distinguishable from a school sponsored graduation ceremony. Griffith cites *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393, 113 S. Ct. 2141, 2147 (1993), for the proposition that "a school district could not permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious perspective," and *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831, 115 S. Ct. 2510, 2517 (1995), for the proposition that a university could not refuse to fund a student publication because it addressed issues from a religious perspective. Finally, she cites

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107-09, 121 S. Ct. 2093, 2100-01 (2001), for the proposition that "the Court found viewpoint discrimination where a public school permitted nonreligious groups to meet on school property after school but prohibited a Christian club from doing so."

¶78     The above decisions are all clearly distinguishable. They each involve voluntary participation. When a Christian Club uses school property as a meeting place, no one is required to attend; the public is free to participate or not. Likewise, when school property is used for the discussion of family issues and child rearing, whether from a religious viewpoint or not, no one is compelled to attend. A high school graduation ceremony, however, is an entirely different matter. Unlike after-hours meetings in *Good News Club* which lacked the imprimatur of the school, the "essence of graduation is to place the school's imprimatur on the ceremony—including the student speakers that the school selected." *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 985 (9th Cir. 2003), *cert. denied*, 540 U.S. 817, 124 S. Ct. 78 (2003). High school graduation is one of life's more significant events. Attendance at high school graduation is compulsory. The speakers chosen by the school clearly have a "captive" audience. The student body of a public school is presumably very diverse with a mix of Christians, Jews, Muslims, atheists, and agnostics, many of whom would resent being required to attend a ceremony in which Christ and His Joy was being *shared* with those present in the captive audience. As the Court acknowledged in *Lee*, our society recognizes that even simply standing or remaining silent can signify adherence to the views of others. *Lee*, 505 U.S. at 593,

34

112 S. Ct. at 2658. Accordingly, a reasonable dissenter could certainly feel that his/her silence signified approval or participation in this public sharing of Christ and His Joy.

¶79    The Court here reasons that the school, through a disclaimer in the graduation program, made it clear that it was not sponsoring the speech. The disclaimer, although it may have alleviated concerns of school "sponsorship" or "entanglement," does not address the coercive effect on dissenters. In *Lee*, the Court held that a school district violated the *Establishment Clause* when it invited a rabbi to deliver a nonsectarian, nonproselytizing prayer at its graduation ceremony. The Court noted the singular importance of a high school graduation as a once-in-a-lifetime event and the susceptibility of adolescents to peer and social pressure. This left a dissenting student with the unduly coercive dilemma of participating in the prayer against her conscience or missing her own high school graduation. Because this dilemma gave the dissenting students no legitimate alternative to attending their graduation, the Court concluded the school district had in effect compelled participation in an explicit religious exercise. *Id.* at 593-94, 112 S. Ct. at 2658-59. The dissenting students in Griffith's class were in the same untenable dilemma. They were part of a captive audience and had to choose between attending the ceremony and turning the other way when the speaker sought to "share Christ and His Joy" or not attending their high school graduation.

¶80    Although Griffith's speech was not as blatant in its proselytizing as the speech the Court uses for contrast from *Cole*, it graphically illustrates the impracticality of having school administrators walk this Constitutional tightrope. What if three of four valedictorians made personal references to Christ or one speaker made five references to

35

Christ? What if a speaker used ten references to "sharing the joy of Allah," would that be free speech or proselytizing? The question is answered in the asking. The line drawing will necessarily be subjective depending upon the administrator. The point being that school districts have a constitutional obligation to avoid violating the *Establishment Clause*. *Santa Fe*, 530 U.S. at 301-02, 120 S. Ct. at 2275. In honoring that obligation, school districts are entitled to a degree of latitude. The proper test is not whether the speech in question would be constitutionally permissible; rather, it is whether the District "acted reasonably to avoid violating the Establishment Clause." *Cole*, 228 F.3d at 1105. There is "no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761-62, 115 S. Ct. 2440, 2446 (1995). Here the District was not engaging in viewpoint discrimination. In demanding that there be no sectarian religious references, it was properly imposing content-based restrictions. It had no other means of preventing the coerced participation in this "sharing" of a sectarian religious experience. *See Lassonde*, 320 F.3d at 984. The Butte School District did not act unreasonably.

¶81    I would affirm the decision of the District Court.


                                        /S/ W. WILLIAM LEAPHART


36