JUSTICE RICE,
dissenting.
¶80 To reach its decision, the Court uses waves of generic statements that fail to account for the facts of this case, the arguments of the Colony, and the applicable legal tests. The Court makes no effort to determine whether the challenged legislation constitutes a religious gerrymander, even though courts “must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.” Lukumi Babalu, 508 U.S. at 534, 113 S. Ct. at 2227. The Court minimizes the Colony’s claim to merely “sincere and heartfelt beliefs that its participation in the governmental program violated its religious beliefs,” and cites to numerous cases that reject claims of that nature, while failing to acknowledge that this case is factually, and fundamentally, different. Opinion, ¶ 42.1 believe the facts and law, when properly considered, demonstrate that the Legislature created a clear religious gerrymander applicable only to the Hutterites and that such action was not justified by a compelling state interest. I would affirm the District Court’s holding that their right to free exercise of religion was violated.
¶81 A law affecting the constitutional guarantee of free exercise of religion is to be both facially neutral and generally applicable. Lukumi Babalu, 508 U.S. at 531-32, 113 S. Ct. at 2226 (citing Smith, 494 U.S. at 879-81, 110 S. Ct. at 1600-01). A law failing to satisfy the requirements of neutrality and general applicability “must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.” Lukumi Babalu, 508 U.S. at 531-32, 113 S. Ct. at 2226. A law is not neutral if the text of the law has a targeting effect or a discriminatory object as discerned from direct and circumstantial evidence. Lukumi Babalu, 508 U.S. at 533-34, 113 S. Ct. at 2227. The Court in Lukumi Babalu stated:
Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt. ‘The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.’
Lukumi Babalu, 508 U.S. at 534, 113 S. Ct. at 2227 (quoting Walz v. Tax Comm’n of New York City, 397 U.S. 664, 696, 90 S. Ct. 1409, 1425 *89 (1970) (Harlan, J., concurring)). In determining that the contested ordinances in Lukumi Babalu were not neutral, the Court reviewed the legislative record and history surrounding the enactment of the ordinances, stating, “the effect of a law in its real operation is strong evidence of its object.” Lukumi Babalu, 508 U.S. at 535, 113 S. Ct. at 2228. The Court found that the four contested ordinances created an impermissible religious gerrymander because they “were drafted in tandem” to “target petitioners and their religious practices.” Lukumi Babalu, 508 U.S. at 535, 113 S. Ct. at 2228.
¶82 To appreciate the Hutterites’ arguments, it is first necessary to understand their unique religious principles. The Court offers generally that the Hutterite faith is one in which “all members agree to live a communal life and follow the teaching and tenets of the Hutterische Church Society,” Opinion, ¶ 9, but fails to discuss the manner in which the Hutterites were targeted or articulate the critical tenets which the legislation would require the Hutterites to violate in order to participate in the workers’ compensation system.
¶83 To begin, the record establishes that a hallmark of the Hutterite religion is the communal lifestyle where religious exercise and labor are not divisible because “[a]ll labor and support provided by members to the Colony is done for their own personal religious purpose without promise or expectation of compensation. The performance of labor and support for the Colony is an act of religious exercise.” Hutterites eat meals, worship, work, and are educated entirely communally and they do not associate with “non-members.” The Membership Declaration, to which every member of the Colony must subscribe, affirms each member’s responsibility to relinquish current and future property rights to the Colony, and members are not permitted a wage or salary. In fact, the Hutterite faith prohibits the payment of wages for labor performed by its members. At oral argument, the State conceded that the wage replacement component of workers’ compensation coverage would not be applicable to Colony members because, pursuant to their tenets of faith, they cannot receive wages.[1] Farming and agricultural production has been a part of the Hutterite lifestyle for hundreds of *90 years and is specifically named in the Colony’s Articles of Incorporation and the Hutterian Brethren Church Constitution as a central component of the Colony’s livelihood. The Colony also participates in manufacturing and construction projects.
¶84 In Wisconsin v. Yoder, 406 U.S. 205, 92 S. Ct. 1526 (1972), parents of Amish children challenged Wisconsin’s law requiring all children to attend school until age 16, claiming that their beliefs required children to be educated within the Amish community after completion of eighth grade in order to limit exposure to worldly influences inconsistent with their religious beliefs. Yoder, 406 U.S. at 210-13, 92 S. Ct. at 1530-32. The Supreme Court held that Wisconsin’s compulsory school attendance law unduly burdened the Free Exercise Clause by forcing Amish parents to send their children to public school after the eighth grade in violation of one of the core Amish religious beliefs. Yoder, 406 U.S. at 234-35, 92 S. Ct. at 1542. In its analysis, the Supreme Court stated that “we must be careful to determine whether the Amish religious faith and their mode of life, are ... inseparable and interdependent.” Yoder, 406 U.S. at 215, 92 S. Ct. at 1533. As in Yoder, the record here supports the determination that the communal way of life of the Colony is “one of deep religious conviction, shared by an organized group, and intimately related to daily living.” Yoder, 406 U.S. at 216, 92 S. Ct. at 1533. The command to live communally and without property or legal claims is fundamental to the Hutterite faith.
¶85 In addition to the communal lifestyle that requires renouncement of wages and the ownership of property, and critical to an understanding of the conflict presented by their inclusion into the Workers’ Compensation Act, is the tenet that making a legal claim is a violation of fundamental Hutterian doctrine. Daniel Wipf s affidavit states that “Christians shall not sue one another at law nor sit in judgment of one another. Hutterites cannot make claims against others for wrongs done to them.” The Membership Declaration, which every member of the Colony must sign, states:
I declare that my acceptance of membership and the terms and conditions of membership is a matter of my religious beliefs ... Among those beliefs is the commandment to live at peace with fellow believers, to resolve disputes within the Church, and not to seek redress before secular authorities whether related to secular or sectarian issues.
(Emphasis added.) Wipf s affidavit explains that a member who does not convey his or her “ownership” of a legal claim to the Colony, like other property, would be subject to excommunication, or essentially *91 termination from membership in the Colony. He states, “I do not know of any Hutterite member who has made any workers’ compensation claim against a Hutterite colony in Montana or against the Uninsured Employers^] Fund.”
¶86 HB 119’s legislative history must be considered in order to understand the impact of the bill. The United States Supreme Court has looked both to the text and to the legislative history of a law to determine whether legislators intended to target religious practices, Lukumi Babalu, 508 U.S. at 533-34, 113 S. Ct. at 2227, although the Court fails to do so here. The Department proposed HB 119 to address complaints received “about Hutterite colonies competing with other Montana businesses, such as contractors, without having to provide workers’ compensation insurance.” The only religious group named in the legislative debates surrounding HB 119 was the Hutterites, and both the House and the Senate specifically discussed the impact HB 119 would have on Hutterite colonies. Representative Hunter said, “[i]n particular,' we are speaking of, in [Sections 6 and 7], about Hutterite colonies” when he introduced HB 119 in the House Committee and reiterated this concept to the Senate Committee. Mont. H. Comm. on Bus. & Labor, Hearing on H. Bill 119, 61st Legis., Reg. Sess. (Jan. 8,2009); Mont. Sen. Comm. on Bus., Labor, & Econ. Affairs, Hearing on H. Bill 119, 61st Legis., Reg. Sess. (Mar. 5, 2009). Senator Stewart-Peregoy characterized HB 119 and the corresponding Legislative debate as “targeting” the Hutterites, stating, “ifwe’re going to target a group, we should have just put Hutterite religious organizations and let’s be done with it. ... [W]e are targeting a group and I just wanted that for the record.” Mont. Sen. Comm, on Bus., Labor, & Econ. Affairs, Hearing on H. Bill 119, 61st Legis., Reg. Sess. (Mar. 11, 2009). Additionally, Senator Balyeat acknowledged HB 119 was really “aimed” at the Hutterite religious colonies near Great Falls. Mont. Sen., Floor Session on H Bill 119, 61st Legis., Reg. Sess. (Mar. 16,2009). The legislative record clearly shows that the objective intent of the legislators was none other than to target the Hutterites.
¶87 In response to this expressed legislative intention, the text of HB 119 was amended throughout the legislative process to focus more and more narrowly on the Hutterites. Language was inserted within Section 6’s definition of employer to read “a religious corporation, religious organization, or religious trust receiving remuneration from nonmembers for agricultural production, manufacturing, or a construction project conducted by its members on or off the property of the religious corporation, religious organization, or religious trust.” *92 Section 39-71-117(l)(d), MCA (emphasis added). The language “agricultural production, manufacturing, or a construction project’-instead of all commercial activities-was inserted into HB 119 to incorporate only those specific business enterprises in which the Hutterites engaged. Here, the Court’s tactic of ignoring the facts and over-generalizing HB 119 and the Act as a whole in order to give the appearance that the Act applies equally to all employers is well illustrated. See Opinion, ¶ 21 (“HB 119 regulates the Colony’s engagement in commercial activities in the same manner that the workers’ compensation system regulates the commercial activities of other employers in Montana.”). The Court repeatedly states that HB 119 applies to all “commercial activities” and bases its analysis thereon. See Opinion ¶¶ 18, 21, 23, 24, 25, 26, 27, 30, 41, and 42. However, the text of HB 119 does not apply to “commercial activities” generally, nor does HB 119 use the term “commercial activities” at all. Rather, it employs the phrase “agricultural production, manufacturing, or a construction project”-only those economic activities that the Legislature knew the Hutterites to be engaged in.
¶88 Similarly, the Court makes repeated statements to the effect that all religious employers are treated the same as other employers. See Opinion, ¶ 71 (“HB 119 treats religious organizations no differently than any other employer under the workers’ compensation system”; “the Workers’ Compensation Act creates no separate classification under HB 119 that singles out religious groups for different treatment.”). However, these statements are not supported by the text of HB 119. Religious employers such as a Presbyterian Day Care, a Mormon Cleaning Service, or a Catholic Social Agency would not satisfy HB 119’s definition of religious “employer” for multiple reasons, the first being that they are not engaged in the economic activities targeted by the bill-“agricultural production, manufacturing, or a construction project.”[2],[3]
*93 ¶89 The Court distinguishes cases that have struck down legislation for violating the free exercise right by reasoning that HB 119 “does not place the Colony members in a discriminatory position compared to other religious groups who might choose to engage in similar activity. These distinctions lead us to reject the strict scrutiny analysis ....” Opinion, ¶ 21. Again, this distinction-and the conclusion based thereon to reject strict scrutiny review-is likewise belied by the text of HB 119. The Legislature cleverly drafted Sections 6 and 7 to include only the Hutterites engaged in these economic activities and to exclude other religious groups. Under these provisions, an “employee” must be “a member” of the “religious corporation, religious organization, or religious trust while performing services” for the organization. Correspondingly, an “employer” is defined as a religious organization engaged in the targeted economic activities only when such activities are “conducted by its members.” See Section 39-71-117(l)(d), MCA. As mentioned, all Hutterite labor is provided by members of their communal organization. The “performance of labor” is a religious exercise required of every member “to the extent of his or her ability” and is provided for the “personal religious purpose” of the members. Hutterites do not associate for these purposes with nonmembers, who provide no labor for the organization. By merely hiring employees who are not “members” of their organization, other religious organizations choosing to participate in the named economic activities could be exempted from the provisions of HB 119. The tenets of the Hutterite religion, however, do not permit this evasion, as their labor is provided by members only. HB 119 incorporates religious organizations within workers’ compensation only when “members” (§ 39-71-118(l)(i), MCA) *94 of a religious organization provide labor and services to “nonmembers” (§ 39-71-117(l)(d), MCA)-a scheme which only applies to the religious structure of the Hutterites. There is no evidence in the record that any other religious organization would be incorporated into the workers’ compensation system under these provisions.
¶90 The text reveals further targeting of the Hutterites. HB 119 created the new financial category of “remuneration,” § 39-71-117(l)(d), MCA, and in other provisions drafted in tandem, revised § 39-71-123(5), MCA, to incorporate a method for calculating remuneration so that the Act would apply to the Hutterites, who receive no wages. No other religious organization is identified in the record as using a non-wage system. HB 119’s application to the specified economic activities when “conducted by its members on or off the property” of the religious organization, § 39-71-117(l)(d), MCA, is a reference to the practice of the Hutterites living communally on their own property and providing services off their property.
¶91 Some of these provisions could be potentially innocuous methods of defining a religious entity for incorporation within the workers’ compensation system as part of a broad inclusion of all religious organizations within the system. However, the Legislature did not broadly incorporate all religions. Rather, it enacted these provisions to define and target only the Hutterite religion for inclusion within the system. While the text of HB 119 is not facially discriminatory, its history and text reveal that it nonetheless fails to be neutral and generally applicable. “Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.” Lukumi Babalu, 508 U.S. at 534, 113 S. Ct. at 2227. The effect of HB 119 is to create a religious gerrymander that improperly singles out one religion. Lukumi Babalu, 508 U.S. at 535, 113 S. Ct. at 2228 (“Apart from the text, the effect of a law in its real operation is strong evidence of its object.”). The significance of a religious gerrymander under the proper legal analysis is that it must sustain strict scrutiny review. Lukumi Babalu, 508 U.S. at 531-32, 113 S. Ct. at 2226.
¶92 The Court relies on cases that rejected Free Exercise challenges to truly generally applicable statutes. Generally applicable laws are not subject to strict scrutiny review and thus are more easily defended against challenges. In Alamo Foundation and Jimmy Swaggart Ministries, religious organizations challenged labor and tax laws that were generally applicable to the commercial activities of all organizations, including religious organizations. Similarly, South *95 Ridge Baptist Church, Lee, and Rogue Valley Youth for Christ challenged generally applicable tax and wage requirements. In these cases, the religious organizations merely argued that compliance with such neutral and generally applicable requirements violated the tenets of their faith. Unlike HB 119, there was no effort in those cases to draft the challenged laws with the purpose to gerrymander and include a particular religious organization within the system. The failure to draft HB 119 in a generally applicable manner necessarily requires strict scrutiny review.
¶93 That being so, the State argues that a compelling state interest can be demonstrated. It offers that HB 119 was enacted for two legitimate government interests, including protection of the Uninsured Employers’ Fund (UEF) from potential liability for a catastrophic injury claim filed by a Hutterite member and ensuring fair competition among businesses by eliminating the Hutterites’ perceived advantage. Regarding the first, the UEF only applies to uninsured “employers” who are subject to the Act but have not provided coverage for their employees. See Zempel v. Uninsured Employers’ Fund, 282 Mont. 424, 431, 938 P.2d 658, 663 (1997) (citations omitted) (“[Ojnly injured employees of employers meeting the definition of uninsured employer ... are entitled to the ‘substitute’ workers’ compensation benefits the UEF was created to provide to injured employees of employers who have failed to ‘properly comply’ with the Act.... As a result, the UEF has no funding mechanism to provide ‘substitute’ workers’ compensation benefits to injured employees of employers not subject to the Act.”). Consequently, prior to HB 119, a claim could not have been filed by a Hutterite member against the UEF because the Colony was not an “employer” subject to the Act-and none have been filed. The State is attempting to legitimize HB 119 by arguing that the bill provides a solution to a problem that did not exist prior to the bill’s enactment. Additionally, even if the UEF was a legitimate government concern, HB 119 does not further that concern. As noted by the District Court, a fundamental tenet of the Hutterites’ faith is that they cannot make legal claims against others. The Hutterite faith includes “the commandment to ... not to seek redress before secular authorities whether related to secular or sectarian issues.” A governmental interest in protecting the UEF from claims that are prohibited as a matter of law, made by people whose faith forbids them to make such claims, can hardly be considered “legitimate.”
¶94 The State’s second argument that HB 119 was enacted for a legitimate government purpose pertained to complaints from *96 businesses about unequal competition with the colonies. We recognize that the State has legitimate interests in the financial viability of the workers’ compensation system, in controlling costs, and in providing benefits. See Stratemeyer v. Lincoln Co., 259 Mont. 147, 155, 855 P.2d 506, 511 (1993); Eastman v. Atlantic Richfield Co., 237 Mont. 332, 339, 777 P.2d 862, 866 (1989). However, the State has provided no authority for the proposition that ensuring “competitive fairness” among the state’s businesses is an objective of the workers’ compensation system. Rather, the workers’ compensation system is directed to providing care and rehabilitation to injured workers and returning them to work as soon as possible. Caldwell v. MACo Workers’ Comp. Trust, 2011 MT 162, ¶ 31, 361 Mont. 140, 256 P.3d 923. Further, the State has not made an effort to demonstrate that requiring the Colony to pay for workers’ compensation coverage would actually address the concern over unfair competition, where any competitive advantage of the Colony would appear to be primarily because of its nonpayment of the more substantial expenses of wages and benefits, unique to the Colony’s religious beliefs. The State argues that fairness “is a viable legislative goal, and the Legislature is entitled to take steps to ensure that the workers’ compensation system is fair to all participants, whether religious or secular.” However, whether or not “fairness” among competing businesses is a viable goal of the workers’ compensation system, it pales in comparison to “one of the most cherished and protected liberties in our society,” St. John’s Lutheran Church, 252 Mont. at 523, 830 P.2d at 1276, and cannot be accomplished by legislation that targets a particular religious group and intrudes upon their internal religious practices. The State’s interest in insuring a viable workers’ compensation system or creating a “level playing field” is not legitimized by HB 119 in a way that satisfies the rigorous standards protecting the free exercise of religion.
¶95 The State argues there is a compelling state interest because workers’ compensation, like social security, “serves the public interest by providing a comprehensive insurance system with a variety of benefits available to all participants ...” (quoting Lee, 455 U.S. at 258, 102 S. Ct. at 1055), and this interest is advanced by HB 119’s intention to correct the purported unfair competitive advantage the Colony has over other businesses. However, HB 119 fails to prohibit nonreligious conduct that endangers the State’s purported government interests of preventing a catastrophic claim against the UEF and address the perceived business advantage enjoyed by the Hutterites by not participating in the workers’ compensation system. The Workers’ *97 Compensation Act currently exempts other areas of employment in agriculture, manufacturing, and construction that could affect the UEF or the viability of the workers’ compensation system. For example, § 39-71-401(2), MCA, exempts certain employments from the Act, unless the employer elects coverage and the insurer allows coverage, including: household or domestic employment (§ 39-71-401(2)(a)), casual employment (§ 39-71-401(2)(b)), employment of a person performing services in return for aid or sustenance only (§ 39-71-401(2)(h)), a person who is employed by an enrolled tribal member or an association, business, corporation, or other entity that is at least 51% owned by an enrolled tribal member or members, whose business is conducted solely within the exterior boundaries of an Indian reservation (§ 39-71-401(2)(m)), and a person who is an officer or manager of a ditch company (§ 39-71-401(2)(s)).[4] Similarly, independent contractors may waive rights and benefits of the Act if they obtain an independent contractor exemption (§ 39-71-401(3)). These exemptions are contrary to the governmental interests asserted by the State, and lend further credence that the Legislature’s intent, as demonstrated above, was to pursue “governmental interests only against conduct motivated by religious belief.” Lukumi Babalu, 508 U.S. at 545, 113 S. Ct. at 2233.
|¶96 HB 119 is likewise not narrowly tailored and it places an impermissible burden on the Hutterite religion. A law is narrowly tailored when the law achieves its stated ends without unduly burdening religion. See Lukumi Babalu, 508 U.S. at 546, 113 S. Ct. at 2234; Yoder, 406 U.S. at 220-21, 92 S. Ct. at 1536. Following the United States Supreme Court, this Court has previously applied the Thomas test to determine whether there is a burden on the free exercise of religion:
Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.
Griffith v. Butte Sch. Dist. No. 1, 2010 MT 246, ¶ 62, 358 Mont. 193, 244 P.3d 321 (quoting Valley Christian Sch. v. Mont. High Sch. Ass’n, *98 2004 MT 41, ¶ 7, 320 Mont. 81, 86 P.3d 554; Thomas v. Review Bd. of Ind. Empl. Sec. Div., 450 U.S. 707, 717-18, 101 S. Ct. 1425, 1432 (1981)). There is a burden on the free exercise of religion when the state causes an “internal impact or infringement” on the relationship between a religious entity and its members or “on their sincerely held religious beliefs.” St. John’s Lutheran Church, 252 Mont. at 526, 830 P.2d at 1278. The United States Supreme Court’s 2012 Hosanna-Tabor decision further supports the premise that there is an impermissible burden on the free exercise of religion when a government action causes an “internal impact” on religious beliefs. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Empl. Opportunity Comm’n, _ U.S. _, 132 S. Ct. 694 (2012).
¶97 The State argues that the burden imposed by the workers’ compensation system on the Hutterites is incidental. However, it fails to recognize that the operation of HB 119 and the Act interferes with the internal relationship between the Colony and its members under the central tenets of the Hutterite faith. The Hutterite faith prohibits all property ownership, but the Act requires injured employees to initiate and thus “own” a claim against the employer or its insurer to receive benefits under the Act. See § 39-71-603, MCA. The State argues, and the Court accepts, that self-insurance is a viable option for the Colony, under which a claim would be made to the Colony itself without any determination of whether a member is possessing property. See Opinion, ¶ 63. However, the statute cited for this premise, § 39-71-2103, MCA, actually provides that after an employer is approved to be self-insured, the employer may “make payments directly to the employees as they may become entitled to receive the payments.” Such payments to Colony members are exactly the problem because the Colony’s beliefs require members to relinquish property and live communally.
¶98 Further, in the event a member would file a workers’ compensation claim against the Colony, an act directly contrary to Hutterite religious principles, the member faces excommunication from the Colony. The Court’s solution for this religious burden is that “nothing prevents an injured Colony member from refraining to file a workers’ compensation claim or returning any workers’ compensation claim award” or, alternatively, the Colony could proceed “to excommunicate a member who receives compensation for lost wages and refuses to give the money to the Colony.” Opinion, ¶ 68. The Court thus reasons that the Hutterites could simply forego participation in the system to comply with its religious beliefs. Yet, the financial *99 burden would remain, for which no benefit would be paid. This is the very definition of illusory coverage that “defies logic” and violates public policy. See Hardy v. Progressive Specialty Ins. Co., 2003 MT 85, ¶ 37, 315 Mont. 107, 67 P.3d 892. The Court also reasons that the burden placed upon the Colony could be addressed by a member violating his religious tenets and having the Colony excommunicate the member. Opinion, ¶ 68. I would suggest that this is not a permissible rationale for justifying the State’s internal impact upon a religion’s practices.
¶99 I would thus reject the State’s argument that the burden imposed here is incidental. HB 119 creates a substantial burden on the Colony’s religious practice because, in order for the Colony and its members to actually participate under the Act, they must violate their sincerely held religious beliefs.[5] HB 119 creates substantial internal intrusion into the religious practices of the Colony and its members, burdening the Hutterites’ religious practices. Strict scrutiny review is not satisfied because the law is neither justified by a compelling state interest nor narrowly tailored to advance that interest.[6]
¶100 In my view, the Court fails in its duty to properly undertake the necessary constitutional inquiry. The Court’s over-general statements do not acknowledge the facts of the record. The Court’s reliance on Lyng v. Northwest Indian Cemetery Protective Association, 485 U.S. 439, 108 S. Ct. 1319 (1988), where the United States Supreme Court rejected a challenge to the government’s use of its own property for road construction and the property was deemed sacred by non-owners, provides little authority for this case and less consolation. Our Court has held that “only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.” St. John’s Lutheran Church, 252 Mont. at 524, 830 P.2d at 1276 (quoting Miller v. Catholic Diocese of Great Falls, Billings, 224 Mont. 113, 117, 728 P.2d 794, 796 (1986); Yoder, 406 U.S. at 215, 92 S. Ct. at 1533). However, in my view, such protection has *100 not been provided herein. Had this been the status of religious freedom in 1620, the Pilgrims may well have sailed right by.
¶101 I dissent.
JUSTICE COTTER and JUSTICE NELSONjoininthe dissenting Opinion of JUSTICE RICE.

 The State also argued that Colony members could nonetheless receive medical benefits from the mandated coverage, but this would require the forbidden act of filing a legal claim, discussed further herein. As to medical care, the record reflects that “the colonies fund the medical care that their members need. Each individual Colony still provides full no-fault medical care for its members” and “[r]egardless of the reason for any member’s illness or injury, the member is cared for.”

 These are examples of religious employers who would be exempt from participation under § 39-71-117(l)(d), MCA. However, it is possible that a social agency could come within the definition of employer under § 39-71-117(c), MCA, if it was “funded in whole or in part by federal, state, or local government funds.”

 The Court responds that HB 119 did not need to capture these other religious employers because they and the Hutterites were already included under other statutory provisions. Opinion, ¶ 25. The Court then reasons that the revision to the statutory definition of “wages” to include the concept of “remuneration” was all that was necessary to bring the Hutterites into the workers’ compensation system. Opinion, ¶ *93 26. The State has not made these assertions, and the Court cites neither to authority nor to the record to support them. They are not supported by the plain language of the other provisions, which makes no reference to religious employers. If religious employers were already completely encompassed by other provisions, it would have been unnecessary to create the new category of “religious organization” within the statutory definition of “employer,” as HB 119 did. See § 39-71-117(l)(d), MCA. Likewise, it would have been unnecessary to create, within the statutory definition of “employee,” the new category of a “member” of a religious organization “while performing services” for the religious organization. See § 39-71-118(1)0), MCA. I note that the former statutory provision under which the religious employer in St. John’s Lutheran Church was required to participate in workers’ compensation was subsequently repealed. See Sec. 13, Ch. 448, L. 2005. Context matters, and I believe that consideration of context should include all of the text of HB 119, the Act as a whole, and the legislative history, which reveal an effort of laser-like precision to capture only the Hutterites.

 This Court has periodically discussed these exemptions to the Act, see i.e., Weidow v. Uninsured Employers’ Fund, 2010 MT 292, 359 Mont. 77, 246 P.3d 704; Cottrill v. Cottrill Sodding Serv., 229 Mont. 40, 744 P.2d 895 (1987); Bennett v. Bennett, 196 Mont. 22, 637 P.2d 512 (1981).

 No question has been raised about the sincerity of the Colony’s religious beliefs. See i.e., Sherbert v. Verner, 374 U.S. 398, 399 n. 1, 83 S. Ct. 1790, 1791 n. 1 (1963).

 The Court responds to the claim that HB 119 intrudes into the religious practices of the Colony by listing regulatory statutes that would apply to the Colony’s business activities. See Opinion, ¶ 62. However, these statutes regulate the Hutterites’ external activities and do not intrude into their internal religious practices, as do the provisions at issue here.